UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ERICA BENTO and** | : | |
| **MELISSA DUBIEL,** | : | **CIVIL ACTION NO.** |
| **Plaintiffs** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **CITY OF MILFORD,** | : | |
| **MILFORD DEPARTMENT OF HUMAN** | : | |
| **SERVICES AND YOUTH AND FAMILY** | : | |
| **SERVICES, and LISA DIAMOND GRAHAM,** | : | |
| **in her individual and official capacities,** | : | |
| **Defendants.** | : | **SEPTEMBER 23, 2013** |
| | : | |

## COMPLAINT

### I.  INTRODUCTION

1.     Through this action, Plaintiffs, Erica Bento and Melissa Dubiel, challenge the unlawful and retaliatory conduct of Defendants, City of Milford, Milford Department of Human Services and Youth and Family Services (hereinafter "DHS"), and Lisa Diamond Graham, the Executive Director of DHS, in violation of the Fourteenth Amendment of the U.S. Constitution, Conn. Gen. Stat. § 31-51q, Conn. Gen. Stat. § 31-51m, Conn. Gen. Stat. § 46a-60, and Conn. Gen. Stat. § 31-290a.

### II.  PARTIES

2.     Plaintiff, Erica Bento (hereinafter "Bento"), is an individual residing in Milford, Connecticut.

3.     Plaintiff, Melissa Dubiel (hereinafter "Dubiel"), is an individual residing in Milford, Connecticut.

4.     Defendant, City of Milford (hereinafter "the City"), is a municipality and political subdivision of the State of Connecticut.  The City employs more than 50 individuals, and is an employer subject to the requirements of Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, as amended, the Connecticut Fair Employment Practices Act, and Conn. Gen. Stat. § 31-290a.

5.     Defendant, Milford Department of Human Services and Youth and Family Services (hereinafter "DHS"), is a department of the Defendant City of Milford.  Defendant DHS is led by an Executive Director, who is supposed to be subject to oversight by the DHS Board of Directors.

6.     Defendant, Lisa Diamond Graham (hereinafter "Graham"), is the Executive Director of Defendant DHS.  Defendant Graham is an official policymaker of Defendants DHS and City of Milford and, at all times relevant to this Complaint, acted under the color of state law.

## III.    JURISDICTION

7.     This Court has subject matter jurisdiction over this matter because it presents federal questions under 28 U.S.C. § 1331, and Plaintiffs' state law claims are properly before this Court under 28 U.S.C. § 1367(c).

8.     Plaintiffs have previously exhausted all administrative remedies relating to the claims asserted herein.  On December 13, 2012, Plaintiffs filed claims alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. 46a-58 et seq. with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and U.S. Equal Employment Opportunity Commission ("EEOC"), designated as CHRO Nos. 1330222 and 1330223 and EEOC Nos. 16A-

2013-00508 and 16A-2013-00573.  On July 9, 2013, the CHRO issued a release of jurisdiction relating to said claims.  On July 22, 2013, Plaintiff Bento filed a separate claim of discrimination with the CHRO and EEOC alleging a violation of Conn. Gen. Stat. § 46a-60 and the Americans with Disabilities Act.  Said claim was designated as CHRO No. 1430037, and EEOC No. 16A-2013-01417.  On September 12, 2013, the CHRO issued a release of jurisdiction relating to said claim.  Plaintiffs' requests for right to sue letters from the EEOC are still pending.

## IV.   BACKGROUND

9.      Bento has been employed as a community outreach worker with the DHS since August of 2008, while Dubiel has worked as the DHS secretary/bookkeeper since September 6, 2004.

10.     Starting in April of 2011, Plaintiffs made a number of written complaints, outside the scope of their official job duties, to officials within the City about the conduct of Defendant Graham.  Despite those complaints, however, the City failed to take proper remedial action to cease Defendant's Graham's unlawful behavior, or to protect Plaintiffs from a foreseeable and predictable pattern of retaliation.

11.     Plaintiffs are not the first employees of DHS who Defendant Graham has targeted.  Defendant Graham previously violated the rights of [**Employee 1**].  Defendant Graham demanded the disclosure of [**Employee 1's**] private medical information, and then disclosed [**Employee 1's**] private medical information to other employees in the office.  Defendant Graham also subjected [**Employee 1**] to harassment and verbal abuse that was so severe that [**Employee 1**] had to remain in an office with the door closed in an effort to create some separation from Defendant Graham.  Defendant Graham also removed job duties from [**Employee 1**] and interfered with [**Employee 1's**] ability to perform the job.  As part of

Defendant Graham's efforts to retaliate against [**Employee 1**], Defendant Graham would pressure other DHS employees to provide Defendant Graham with information regarding [**Employee 1's**] personal affairs, and to provide written statements about [**Employee 1**] that Defendant Graham intended to use in her efforts to target [**Employee 1**].  Defendant Graham would then direct DHS employees to edit those written statements about [**Employee 1**] in accordance with Defendant Graham's instructions.  Defendant Graham also abused her authority to violate the rights of [**Employee 2**].  While [**Employee 2**] was out of work on a medical leave, but still employed by the City, [**Employee 2**] qualified for a longevity check.  After the City issued the longevity check, Defendant Graham intercepted the check and refused to release the check to [**Employee 2**].  Defendant Graham then retroactively terminated the employment of [**Employee 2**] to a date before the longevity check was earned.  [**Employee 1**] strongly objected to this conduct by Defendant Graham, which only caused Defendant Graham to take additional acts of retaliation against [**Employee 1**].  [**Employee 3**] filed a complaint against Defendant Graham in response to conduct by Defendant Graham that [**Employee 3**] found to be harassment that created a hostile working environment.

12.     Based on these examples, and others, Defendants City of Milford and DHS had knowledge of Defendant Graham's previous efforts to retaliate against employees, but failed to act to prevent Defendant Graham from continuing to abuse her authority in ways that violated the rights of employees who worked at DHS.

13.     For years, Defendant Graham has operated the DHS without regard to the personal privacy rights of the employees who report to her.  She demands the disclosure of private and confidential information from employees, and punishes employees who resist disclosure.  If an employee will not share his or her own private information, then she coerces

4

other employees to obtain information about the employee and then report back to her so that she can then make use of that information.  Staff meetings are often transformed into group sessions where the personal and private information of employees is shared, some times over the objection of the employee involved.  For instance, Defendant Graham disclosed to DHS staff members that Plaintiff Dubiel had been hospitalized, underwent surgery, and was having bloodwork done relating to a medical issue.  Defendant Graham disclosed confidential and private information regarding serious medical issues involving Plaintiff Bento's minor child.  A staff member who was dealing with issues of substance abuse had his/her private and confidential medical information shared over the course of numerous staff meetings at DHS (Defendant Graham also discussed that information with individuals outside of DHS). Defendant Graham disclosed that a staff member's family member was dealing with cancer in such a fashion that caused the staff member to leave the meeting in tears.  Defendant Graham disclosed that another staff member was having difficulty getting pregnant.

    14.    On April 11, 2011, Plaintiffs submitted a written complaint to John O'Connell, the City's Personnel Director, which, among other things, described "an atmosphere of tension, distrust, and harassment [that] is prevalent on a daily basis" at DHS and objected to Defendant Graham (i) reporting inflated and inaccurate statistics about DHS programs to the DHS Board and at public meetings, which contradict the statistics provided to the Connecticut Department of Social Services; (ii) disclosing personal details of staff members with other employees, without respecting rights of privacy; and (iii) disclosing employee's salaries, benefits, and personal financial issues to other staff in a way that is humiliating and invasive of privacy rights.  In one example, this complaint identified an instance in which Defendant Graham communicated to all attendees of a DHS meeting that Bento's family was a "Milford working family in need" who

5

needed donations from the office. Bento did not request this solicitation and was humiliated that her personal financial information had been disclosed to others; she refused to accept any donations. The April 2011 complaint also charged that (iv) "there is a lack of client confidentiality in our office;" (v) "formal complaints have been filed by several previous interns from [Southern Connecticut State University] regarding their internship experience at Milford Youth and Family Services;" and (vi) "Clients that come into our office are not treated in a fair and equal manner."

15.     Unfortunately, following that April 11, 2011 meeting with Mr. O'Connell, the City of Milford failed to address the serious problems identified by Plaintiffs. Consequently, the disturbing conduct continued to manifest.

16.     On January 29, 2012, Bento filed a written complaint with Steven Fournier, Assistant to the Mayor, detailing Defendant Graham's unlawful invasion of her privacy rights. This complaint explained how, on January 23, 2012, Defendant Graham demanded that Bento sign a release authorizing Bento's family therapist to release confidential and privileged information regarding the counseling provided to Bento and her family to Defendant Graham. When Bento appropriately refused the unlawful request, Defendant Graham retaliated against her by immediately disclosing information regarding Bento's personal affairs to other employees, over Bento's objection. The events at work on that date caused Bento to be hospitalized overnight for stress, and she was unable to work on the following day, January 24, 2012. When Bento returned to work on January 25, 2012, Defendant Graham asked Bento to disclose details about what required her hospitalization. When Bento explained that the events of January 23, 2012 made her uncomfortable about disclosing any personal information, Defendant Graham exploded in a rage and screamed, "Are you fucking kidding me? After all I have done for you;

6

you are not going to do this to me!"  At that point, as Bento's written complaint detailed,
Defendant Graham "got up, slammed the door and continued screaming and cursing at [Bento]."

17.    In February 2012, Plaintiffs filed written complaints with both Steven Fournier,
and John O'Connell.  These complaints again detailed Defendant Graham's continued invasions
of employee privacy rights.  The complaint to John O'Connell also complained about
"discrimination in the workplace."  Bento reported an example of obvious gender discrimination,
in which Defendant Graham stated that she would immediately fire Bento if she ever became
pregnant, and that Bento could file a lawsuit against the City of Milford and her because she
would not deal with Bento being pregnant in the office.  Bento also explained how, when she
became eligible for employment benefits through the City, Defendant Graham told her that she
had to get married by the end of the month (within 3 days) in order for her children to become
eligible beneficiaries of her health insurance benefits.  (In reliance upon Defendant Graham's
representation, Bento accelerated her planned marriage to her then boyfriend and was married
before a local justice of the peace.  Bento subsequently learned, however, that Defendant
Graham lied about Bento's supposed need to be married in order for her dependents to be
eligible for health insurance.  Previously, Defendant Graham had lied to Bento, and also lied to
the State of Connecticut in connection with Bento's application for HUSKY health insurance for
her dependent children, by falsely stating that Plaintiff Bento's children were not eligible for
health insurance through Bento's employment with the City.)  Bento and Dubiel also complained
that Defendant Graham discriminates against potential clients who are receiving government
assistance, such as Section 8 or other Department of Social Services benefits.

18.    Plaintiff Dubiel filed a complaint with Steven Fournier in February 2012, which
stated in part, that "The office has a hostile feel most days.  Lisa's lack of confidentiality in the

workplace by discussing personal issues about other staff, interns and clients in the office, fashioned an atmosphere where tension, distrust, manipulation, and bullying still subsist in the workplace," and also stated that there "is clearly an issue with therapy client confidentiality." She also provided details regarding Lisa Diamond Graham's (i) "inappropriate use of city time" and falsification of her time records; (ii) "inappropriate use of funding," including false statements to the Board of Alderman and the Mayor that DHS acts in a fiduciary capacity for the YMCA regarding the $8,000 "Youth Services Network Grant" from the City of Milford when, in actuality, DHS has only shared a portion of the funds with the YMCA and has several years worth of those grant funds set aside; (iii) misleading statements to the Board of Alderman and the Mayor requesting additional funds without disclosing that the costs for which Defendant Graham was seeking additional funding could have been paid with the tens of thousands of dollars that remained in DHS accounts; (iv) discrimination by Defendant Graham against certain client populations that are already receiving assistance from other government programs, such as Section 8 or Department of Social Services; (v) "inflation of numbers for reports to Board, Mayor, Board of Alderman and Annual Report;" (vi) "alter[ation of] Board of Director meeting minutes before sending to City Clerk's Office and MIS for public record;" and (vii) violations of right of other employees.

19.     On April 17, 2012, Bento and Dubiel filed another written complaint which specifically detailed financial impropriety, fiscal misconduct, and misrepresentation of funds, as well as the ongoing toxic working environment and "discrimination" at the DHS.  In this complaint, Dubiel detailed, among other things, the more than $700,000 of funds held at the time in reserve accounts which Defendant Graham was not properly disclosing to the Board, including $51,130.83 remaining from grants provided by the State of Connecticut requiring that funds be

returned if not spent within the year, and $238,720.40 in funds remaining from grants provided by the City of Milford and which could have been disclosed to the City to save the taxpayers' money. To the knowledge of Bento and Dubiel, when Defendant Graham requested additional funding from the City of Milford and the Board of Alderman, she did not disclose the existence of more than $700,000 still remaining in the DHS reserve accounts at the time.

20. In May 2012, Dubiel participated in a meeting with the Finance Director, and in September 2012, they both met again with the Personnel Director. But, following that meeting, the City of Milford still failed to take any meaningful action to address these issues and insist upon accountability for the benefit of the community and the taxpayers.

21. In October 2012, Plaintiffs detailed their concerns to Mayor Benjamin Blake, in a letter from their counsel that was also delivered to Defendant Graham and others. The October 2012 letter to Mayor Blake, which is incorporated herein by reference, indicated that Plaintiffs were writing outside the scope of their official job duties to address matters that they believed to be of public concern regarding Defendant Graham's conduct as the Executive Director of DHS, and the City of Milford's complete failure to address the issues in response to previous complaints by Plaintiffs to City officials. The October 2012 letter detailed and amplified Plaintiffs' previous complaints to the City regarding Defendant Graham's conduct, including, but not limited to, allegations that Defendant Graham reported inaccurate information to the City regarding DHS operations and finances, made misleading statements regarding public funds, falsified her own time records, violated the constitutional rights and privacy rights of employees, violated the privacy rights of clients who receive counseling from DHS, retaliated against people who opposed her, discriminated against employees, and discriminated against clients who receive other forms of government assistance (such as Section 8 or Department of Social

Services benefits).  The October 2012 letter also advised the City that state and federal law

prohibited retaliation against Plaintiffs for exposing the issues relating to Defendant Graham and

DHS, and that the City was under a duty to preserve relevant documents and electronically stored

information since there was a potential for litigation in this matter.

22.     Following the delivery of the October 2012 letter to Mayor Blake, Defendants

have engaged in a consistent pattern of harassment and retaliation against Plaintiffs.

23.     After receiving a copy of the October 2012 letter, Defendant Graham became

very upset with Plaintiffs.  Defendant Graham clearly communicated to officials within the City

that she was angry with Plaintiffs, and that she wanted Plaintiffs removed from their positions.

Plaintiffs also observed Defendant Graham uncharacteristically shredding documents shortly

after she received a copy of the October 2012 letter to Mayor Blake.

24.     Following the delivery of the October 2012 letter, Plaintiffs were treated less

favorably than other employees.  For instance, Defendant Graham subjected Plaintiffs to

hyperscrutiny, arranged for other employees in the office to monitor Plaintiffs while she was not

in the office, demanded documentation of Plaintiffs' communications, removed responsibilities

that Plaintiffs previously performed, surveilled Plaintiff Bento when she was working at other

locations, searched in Plaintiffs' desks, logged into Plaintiffs' computers and e-mail accounts,

sent numerous electronic communications to Plaintiffs while they are out of the office for

purposes of harassing Plaintiffs, discussed the complaint with members of the community in a

way that is disparaging towards Plaintiffs, and poisoned Plaintiffs' relationships with other staff

members that reported to her.

25.     After the October 2012 letter, Mayor Blake appointed Plaintiff Bento to serve as a

member of the City's Hurricane Sandy Task Force.  In response, Defendant Graham responded

with anger and demanded that the Mayor remove Plaintiff Bento as a member of the Task Force, but the Mayor refused to rescind Bento's appointment.

26.     Following the City's receipt of the October 2012 letter, the City hired an outside lawyer to conduct an investigation.  As part of the investigation, the outside lawyer interviewed some, but not all, relevant witnesses.  Defendant Graham had knowledge that staff employed at DHS were being interviewed by the outside lawyer, and proceeded to coordinate with them about their statements to the outside lawyer in advance of the interviews.  In addition, other officials at the City tried to pressure certain witnesses to provide false information to the outside lawyer conducting the investigation, or to deny having participated in certain conversations with Plaintiff Bento or Plaintiff Dubiel.  Through their counsel, Plaintiffs have requested copies of documents relating to the investigation conducted by the outside lawyer into their complaints, but the City has refused to release those documents.

27.     Defendant Graham has also acted intentionally to cause Bento to suffer severe emotional distress.  Plaintiff Bento suffers from panic disorder, generalized anxiety, and post-traumatic stress disorder, and Defendants have knowledge of these conditions.

28.     Despite knowledge of Plaintiff Bento's conditions, and Plaintiff Bento's susceptibility to anxiety and stress, Defendant Graham has caused Plaintiff Bento to suffer a series of panic attacks at work since the delivery of the October 2012 letter.

29.     On November 30, 2012, Bento suffered a panic attack at work when Defendant Graham cornered Bento at the office and tried to coercively interrogate her in the presence of Defendant Graham's subordinate employees who she summoned for the purpose of "taking notes."  Plaintiff Bento called the Assistant City Attorney for the City of Milford, Debra Kelly,

11

while she was crying and in a state of obvious distress. It was necessary for Plaintiff Bento to leave work early on November 30, 2012, and miss work on December 3, 2012.

30. On December 3, 2012, Plaintiff Bento communicated to the Mayor of the City of Milford, through her legal counsel, that Defendant Graham was engaging in harassment and retaliation against Bento, which was causing her to experience "emotional trauma." In that communication, the City of Milford was also advised that it was necessary for Bento to seek medical attention because of Defendant Graham's conduct on November 30, 2012, and Bento requested, through her counsel, that the City take immediate action to prevent any further harassment or retaliation against Plaintiff Bento by Defendant Graham so that Bento did not suffer additional harm.

31. In or about December 13, 2012, Plaintiffs filed charges of discrimination and retaliation with the Commission on Human Rights and Opportunities and the U.S. Equal Employment Opportunity Commission asserting claims under the Connecticut Fair Employment Practices Act and Title VII of the Civil Rights Act of 1964. Defendants received notice that Plaintiff would be filing those complaints on December 11, 2012.

32. After it became obvious that Defendant Graham's treatment towards Plaintiff Bento was causing Plaintiff Bento to experience additional anxiety and emotional distress, Defendant Graham took advantage of that fact and began subjecting Plaintiff Bento to additional forms of harassment that were specifically intended to cause Plaintiff Bento to suffer increased anxiety, and increased emotional distress. Of note, Defendant Graham began demanding that Plaintiff Bento attend unnecessary meetings with Defendant Graham, during which Defendant Graham would have another one of her subordinate employees, who was loyal to Defendant Graham, present to "take notes." Defendant Graham would meet and coordinate with the other

12

subordinate employee who was loyal to Defendant Graham in advance of the meetings with Plaintiff Bento, and then Defendant Graham and the subordinate employee would meet after the meeting for purposes of editing notes of the meeting.  After Defendant Graham and the subordinate employee typed and edited the notes of the meeting, the original handwritten notes were destroyed.  During the meetings, Defendant Graham would question Plaintiff Bento in ways calculated to cause Plaintiff Bento to become anxious and uncomfortable.  Defendant Graham did not subject the other outreach workers at DHS to similar meetings, or otherwise hyperscrutinize the work of the other outreach workers at DHS as she did to Plaintiff Bento.

33.     On April 16, 2013, Defendant Graham subjected Bento to another unwarranted and retaliatory 2-on-1 interrogation, which caused Bento to have another panic attack at work. Mindy Natale, the Clinical Coordinator at DHS, participated in that meeting with Defendant Graham.  Ms. Natale is extremely loyal to Defendant Graham.  Plaintiff Bento left work early on that date and went to the hospital.

34.     On April 16, 2013, Plaintiff Bento communicated to the City of Milford, through her legal counsel, that she suffered another panic attack at work, and had to go to the hospital, because of a 2-on-1 interrogation by Defendant Graham.

35.     On April 16, 2013, and on other dates in April 2013, Plaintiff Bento requested, through her legal counsel, that Defendants adopt certain reasonable accommodations for her conditions so that she would not continue to be placed in situations at work by Defendant Graham that caused her to suffer panic attacks and need to seek medical attention.

36.     For instance, Plaintiff Bento requested, through her legal counsel, to report to another supervisor.  Defendants denied that request, and forced Bento to continue reporting to

Defendant Graham, without putting procedures in place to protect her from additional acts of harassment and retaliation.

37.     The City of Milford communicated that they would not be changing Bento's reporting relationship, and that Defendant Graham would have one of her subordinate employees present to take notes of all meetings between Defendant Graham and Bento.  Plaintiff Bento objected to that ongoing procedure, as the meetings felt like 2-on-1 interrogations and caused Bento to suffer anxiety and experience panic attacks.  Furthermore, Bento felt additional anxiety during these meetings that were attended by one of Defendant Graham's subordinate employees because Bento knew that Defendant Graham and the subordinate employee would meet after the conclusion of the meetings for purposes of editing the notes of the meeting, and would destroy the original notes of the meeting.  It also made Bento anxious that Defendant Graham and the subordinate employee would meet for purposes of coordination, in advance of the meetings.  In lieu of having a third person present under circumstances that caused Bento to suffer additional anxiety, Bento proposed a reasonable accommodation, through her legal counsel, that the meetings between Bento and Defendant Graham simply be tape recorded if the City felt a need to have some record of the meetings between Defendant Graham and Plaintiff Bento.

38.     Tape recording the meetings would have decreased Bento's anxiety, and lowered the likelihood of Bento suffering panic attacks for a number of reasons.  Since the meetings would be tape recorded, it would obviate the need to have a 3rd person present to take notes, which made Bento feel as though she was being subjected to 2-on-1 interrogations.  Since the meetings would be tape recorded, Bento would not have any anxiety that Defendant Graham and the subordinate employee would work together to edit the notes, outside of her presence, following the conclusion of the meetings.

39.     The City of Milford, however, denied Bento's requested reasonable accommodation of eliminating the procedure of having another one of Defendant Graham's subordinate employees taking notes of in person meetings, and simply tape recording those meetings.

40.     In April 2013, the City requested that Bento provide a letter from her doctor supporting her requests for reasonable accommodations.

41.     On April 26, 2013, Bento provided the City with a letter from her doctor supporting her requests for reasonable accommodation.  The letter, which was dated April 24, 2013, stated:

> Erica suffers from panic disorder, generalized anxiety and post traumatic stress disorder. I am requesting that due to symptoms of these conditions that reasonable accommodations be made in her workplace.  She has suffered from at least two panic attacks at work since November 2012, both triggered by interaction with her current supervisor in which Erica felt interrogated and "ganged up upon" due to presence of a third party in a room with door closed and due to the line of questioning and threatening tone of voice.  Assuming her current supervisor remains in place, the specific requested accommodations would include:  instead of having a third party in the room, I propose that the in person meetings between Erica and her supervisor be tape recorded.  If that would place an undue burden on the employer, than I propose the following:  having door remain open during interactions with current supervisor, that supervisor be mindful of the tone of voice she uses so as not to be threatening or confrontational, that third party in room who is recording the interaction be a person who is neutral and nonthreatening to Erica.  It is my opinion that with these accommodations in place that Erica's symptoms of her above conditions would be better controlled and her workplace stressors/triggers lessened.

42.     Despite the letter from Bento's doctor, Defendants still denied her requests for reasonable accommodations in the form of tape recording the meetings instead of having another one of Defendant Graham's subordinate employees present for the meeting to take notes, which they would then edit together after the conclusion of the meeting.

43.     Defendants also denied the request from Bento's doctor that the other person in the room be someone who is neutral and nonthreatening to Bento.  In all of the meetings, Defendants selected another one of Defendant Graham's subordinate employees to be present. The other subordinate employees selected were not neutral.  In fact, they report directly to Defendant Graham and were loyal to Defendant Graham.  Moreover, the employees and Defendant Graham would meet together after the conclusion of the meetings for purposes of selectively editing the notes in a manner that was favorable to Defendant Graham, and destroy the original notes of the meetings (in violation of the duty to preserve evidence relevant to litigation).

44.     In some meetings, Defendant Graham also violated the request from Bento's doctor that she avoid using a confrontational or threatening tone of voice towards Bento.

45.     On July 10, 2013, Bento suffered another panic attack as a result of Defendant Graham's conduct during an in-person meeting.  In this meeting, Defendant Graham issued Bento an unwarranted verbal warning, which she subsequently documented in writing.  It was necessary for Bento to leave work early and she called her doctor to schedule an appointment. Mindy Natale also participated in this meeting with Defendant Graham.  Defendant Graham was very confrontational during this meeting, and it felt like a coordinated 2-on-1 interrogation. Bento asked for a neutral third party to attend the meeting, but Defendant Graham denied that request.

46.     When Bento saw her doctor, he placed her on Family Medical Leave from July 11, 2013 until August 11, 2013 because of severe panic and anxiety symptoms.  Bento's doctor subsequently extended that leave until September 3, 2013.

47.     Defendant Graham has also subjected Bento to harassment and retaliation in connection with Bento's appointment, by Mayor Blake, to a Disaster Case Management ("DCM") position as part of a joint initiative between the Red Cross, the Salvation Army, and the City of Milford to provide assistance to Milford residents impacted by disasters such as Hurricane Sandy.  Mayor Blake appointed Bento to this role in early 2013.  At the outset, for purposes of her DCM responsibilities, Bento was supposed to be reporting to Tom Ivers, Milford's Community Development Block Grant Coordinator, and members of the Individual and Family Assistance Task Force of the City of Milford, who had relevant knowledge and background pertaining to DCM.  Defendant Graham, however, altered that reporting structure and ensured that Bento reported directly to her in connection with her performance of the DCM responsibilities, even though Defendant Graham lacks the knowledge and background concerning DCM that Mr. Ivers and the Task Force possess.  Once she regained supervisory control and authority over Bento's DCM responsibilities, Defendant Graham used that authority to further harass and retaliate against Bento, and to make it difficult for Bento to succeed in this role.  Defendant Graham has mandated that all communications to and from Bento relating to the DCM position be passed through Defendant Graham first.  Defendant Graham has also asserted control over Bento's meetings and schedules relating to the DCM position in a way that is unlike her treatment of any other person under her supervision.  Defendant Graham has gone out of her way to monitor and micromanage Bento's activities relating to the DCM position, to the point of monitoring Bento's presence at the Red Cross building where Bento has been assigned to perform DCM job responsibilities, and directing subordinates to drive past the Red Cross building to determine if Bento is there.  Defendant Graham took these actions to make things difficult for Bento, even though she was also interfering with the effective operation of this

important DCM program, and ultimately, harming the residents of the City of Milford impacted by disasters who the program was supposed to help.

48.     When Plaintiff Bento returned to work on September 3, 2013, she was told that she would once again be splitting her time between the DHS office (2 days per week) and the office of the Red Cross in Milford (3 days per week), where she was supposed to be resuming her DCM job responsibilities assisting Milford residents impacted by Hurricane Sandy. However, when Plaintiff Bento reported to the Red Cross building that week, she had no office in which to work, and no computer to use to do her work.  She immediately notified Defendant Graham of these issues, but received no assistance from Defendant Graham, who told Bento to spend her day copying files.

49.     Plaintiff Bento has made complaints to the Mayor's office relating to Defendant Graham's conduct relating to Bento's role in the DCM position, but has received no relief.  On September 10, 2013, Bento requested that Mayor Blake either re-establish Bento's reporting structure to Tom Ivers and the Individual and Family Assistance Task Force relating to her job responsibilities in the DCM position, or remove her from the appointment to the DCM position altogether.  As Bento explained in her communication to Mayor Blake, Defendant Graham's efforts to monitor and micromanage and harass Bento relating to the DCM position have become intolerable, and have also interfered with the effective operation of the DCM initiative and harmed Milford residents who the program is supposed to be helping.

50.     Defendant City of Milford has responded to Plaintiffs' previous efforts to raise these issues with deliberate indifference.  Despite numerous complaints over a number of years about the conduct of Defendant Graham, from Plaintiffs and others, the City has failed to take proper action.

18

**COUNT ONE:**     **VIOLATION OF FOURTEENTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 (by BENTO Against ALL DEFENDANTS)**

51.     Based on the foregoing, Defendants have violated Plaintiff Bento's substantive due process rights in violation of the Fourteenth Amendment to the U.S. Constitution, enforced through 42 U.S.C. § 1983.

52.     Based on the foregoing, Defendants have also violated Plaintiff Bento's privacy rights in violation of the Fourteenth Amendment to the U.S. Constitution, enforced through 42 U.S.C. § 1983.

53.     Defendant Graham acted under the color of state law in an arbitrary, capricious, and outrageous fashion to abuse her authority and violate Plaintiff Bento's constitutional rights. Defendant Graham's conduct "shocks the conscience."

54.     Plaintiff Bento suffered harm as a result of Defendants' violation of her constitutional rights, including, but not limited to, emotional distress and loss of enjoyment.

55.     Plaintiff Bento has also incurred attorney's fees and costs in pursuing this action.

56.     Plaintiff Bento is also entitled to punitive damages.

**COUNT TWO:**     **VIOLATION OF CONN. GEN. STAT. § 31-51q (by BENTO Against Defendants CITY OF MILFORD and DHS)**

57.     Based on the foregoing, Defendants City of Milford and DHS disciplined or otherwise discriminated against Bento because of her protected activity in violation of Conn. Gen. Stat. § 31-51q.

58.     Plaintiff Bento spoke as a citizen on matters of public concern, and said speech was protected under the provisions of Conn. Gen. Stat. § 31-51q, including Sections 3, 4, or 14 of Article First of the Connecticut Constitution.

19

59.     Defendants had knowledge of Plaintiff Bento's protected speech, and they retaliated against Plaintiff Bento because of that protected speech.

60.     Plaintiff Bento has suffered damages as a result of Defendants' conduct, including, but not limited to, emotional distress and loss of enjoyment.

61.     Plaintiff Bento has also incurred attorney's fees and costs in pursuing this action.

62.     Plaintiff Bento is also entitled to punitive damages.

**COUNT THREE:     VIOLATION OF CONN. GEN. STAT. § 31-51q (by DUBIEL Against Defendants CITY OF MILFORD and DHS)**

63.      Based on the foregoing, Defendants City of Milford and DHS disciplined or otherwise discriminated against Dubiel because of her protected activity in violation of Conn. Gen. Stat. § 31-51q.

64.     Plaintiff Dubiel spoke as a citizen on matters of public concern, and said speech was protected under the provisions of Conn. Gen. Stat. § 31-51q, including Sections 3, 4, or 14 of Article First of the Connecticut Constitution.

65.     Defendants had knowledge of Plaintiff Dubiel's protected speech, and they retaliated against Plaintiff Dubiel because of that protected speech.

66.     Plaintiff Dubiel has suffered damages as a result of Defendants' conduct, including, but not limited to, emotional distress and loss of enjoyment.

67.     Plaintiff Dubiel has also incurred attorney's fees and costs in pursuing this action.

68.     Plaintiff Dubiel is also entitled to punitive damages.

**COUNT FOUR:     VIOLATION OF CONN. GEN. STAT. § 31-51m (by BENTO Against Defendants CITY OF MILFORD and DHS)**

69.     Based on the foregoing, Defendants City of Milford and DHS retaliated against, disciplined, or otherwise penalized Bento because Bento, or a person acting on Bento's behalf,

reported, verbally or in writing, a violation or a suspected violation of state or federal law to a public body, or the unethical practices, mismanagement, or abuse of authority by her employer.

70.     The City of Milford and DHS had knowledge of Bento's protected activity, and retaliated against Bento because of that protected activity.  Defendants engaged in acts of retaliation against Bento shortly after learning of Bento's protected activity.

71.     Plaintiff Bento has suffered damages as a result of Defendants' conduct, including, but not limited to, emotional distress and loss of enjoyment.

72.     Plaintiff Bento has also incurred attorney's fees and costs in pursuing this action.

**COUNT FIVE:          VIOLATION OF CONN. GEN. STAT. § 31-51m (by DUBIEL**
**Against Defendants CITY OF MILFORD and DHS)**

73.     Based on the foregoing, Defendants City of Milford and DHS retaliated against, disciplined, or otherwise penalized Dubiel because Dubiel, or a person acting on Dubiel's behalf, reported, verbally or in writing, a violation or a suspected violation of state or federal law to a public body, or the unethical practices, mismanagement, or abuse of authority by her employer.

74.     The City of Milford and DHS had knowledge of Dubiel's protected activity, and retaliated against Dubiel because of that protected activity.  Defendants engaged in acts of retaliation against Dubiel shortly after learning of Dubiel's protected activity.

75.     Plaintiff Dubiel has suffered damages as a result of Defendants' conduct, including, but not limited to, emotional distress and loss of enjoyment.

76.     Plaintiff Dubiel has also incurred attorney's fees and costs in pursuing this action.

**COUNT SIX:          RETALIATION IN VIOLATION OF THE CONNECTICUT FAIR**
**EMPLOYMENT PRACTICES ACT (by BENTO Against Defendants**
**City of Milford and DHS)**

21

77.     Based on the foregoing, Defendants City of Milford and DHS have also retaliated against Plaintiff Bento because she engaged in protected activity in violation of the Connecticut Fair Employment Practices Act.

78.     Plaintiff Bento engaged in protected activity under CFEPA, and Defendants had knowledge of that protected activity.  Defendants engaged in acts of retaliation against Bento shortly after learning of Bento's protected activity.

79.     Plaintiff Bento has suffered damages as a result of Defendants' conduct, including, but not limited to, emotional distress and loss of enjoyment.

80.     Plaintiff Bento has also incurred attorney's fees and costs in pursuing this action.

81.     Plaintiff Bento is also entitled to punitive damages.

**COUNT SEVEN:     RETALIATION IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT (by DUBIEL Against Defendants City of Milford and DHS)**

82.     Based on the foregoing, Defendants City of Milford and DHS have also retaliated against Plaintiff Dubiel because she engaged in protected activity in violation of the Connecticut Fair Employment Practices Act.

83.     Plaintiff Dubiel engaged in protected activity under CFEPA, and Defendants had knowledge of that protected activity.  Defendants engaged in acts of retaliation against Dubiel shortly after learning of Dubiel's protected activity.

84.     Plaintiff Dubiel has suffered damages as a result of Defendants' conduct, including, but not limited to, emotional distress and loss of enjoyment.

85.     Plaintiff Dubiel has also incurred attorney's fees and costs in pursuing this action.

86.     Plaintiff Dubiel is also entitled to punitive damages.

**COUNT EIGHT:**   **RETALIATION IN VIOLATION OF CONN. GEN. STAT. § 31-290a**
                   **(by DUBIEL Against Defendants City of Milford and DHS)**

87.     Based on the foregoing, Defendants City of Milford and DHS have also retaliated

against Plaintiff Dubiel because she filed a workers compensation claim or otherwise asserted

her rights under the Connecticut Workers Compensation Act, in violation of Conn. Gen. Stat. §

31-290a.

88.     Plaintiff Dubiel engaged in protected activity under Conn. Gen. Stat. § 31-290a,

and Defendants had knowledge of that protected activity.  Defendants engaged in acts of

retaliation against Dubiel shortly after learning of Dubiel's protected activity.

89.     On June 26, 2012, Plaintiff Dubiel filed a workers' compensation claim relating to

an injury to her back that she sustained on June 25, 2012.  Defendant Graham has stated to

several people that Plaintiff Dubiel did not injure her back at work as alleged by Plaintiff Dubiel,

and has made hurtful remarks regarding Dubiel as a way to dismiss the validity of Dubiel's

workers compensation claim.  Defendant Graham also complained to the City's risk manager

when Plaintiff Dubiel scheduled a physical therapy appointment related to her workers

compensation injury during the work day.  After Plaintiff Dubiel filed her workers compensation

claim, Defendant Graham removed some of Plaintiff Dubiel's job responsibilities, and has

engaged in a number of retaliatory acts against Dubiel.

90.     Plaintiff Dubiel has suffered damages as a result of Defendants' conduct,

including, but not limited to, emotional distress and loss of enjoyment.

91.     Plaintiff Dubiel has also incurred attorney's fees and costs in pursuing this action.

92.     Plaintiff Dubiel is also entitled to punitive damages.

**COUNT NINE:**   **DISCRIMINATION IN VIOLATION OF THE CONNECTICUT**
                  **FAIR EMPLOYMENT PRACTICES ACT (by BENTO Against**
                  **Defendants City of Milford and DHS)**

93.     Based on the foregoing, Defendants City of Milford and DHS have also discriminated against Plaintiff Bento based on disability, and retaliated against Bento, in violation of the Connecticut Fair Employment Practices Act.

94.     Bento suffers from a disability within the meaning of the Connecticut Fair Employment Practices Act.  Defendants had knowledge of Plaintiff Bento's disabilities.

95.     Defendants have discriminated against Bento on the basis of disability.

96.     Defendants have violated their obligation to reasonably accommodate Bento's disability.

97.     Defendants have failed to engage Bento in a good faith interactive process relating to accommodations of her disability.

98.     By requesting reasonable accommodations for her disabilities, Plaintiff Bento also engaged in protected activity under the Connecticut Fair Employment Practices Act, and Defendants have retaliated against Bento because of her protected activity.

99.      Plaintiff Bento has suffered damages as a result of Defendants' conduct, including, but not limited to, lost wages, lost benefits, emotional distress and loss of enjoyment.

100.    Plaintiff Bento has also incurred attorney's fees and costs in pursuing this action.

101.    Plaintiff Bento is also entitled to punitive damages.

**COUNT TEN:**              **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
                          **(by BENTO Against Defendant GRAHAM)**

102.    Based on the foregoing, Defendant Graham also intentionally inflicted emotional distress upon Plaintiff Bento.

103.    Defendant Graham intend to inflict emotional distress upon Plaintiff Bento, or knew or should have known that emotional distress was the likely result of her conduct.

104.     Defendant Graham's conduct towards Plaintiff Bento was extreme and outrageous, in that it was beyond the bounds of decency tolerated in a civilized society.

105.     Defendant Graham's conduct caused Bento to suffer emotional distress, and said emotional distress was severe.

106.     Defendant Graham had knowledge of the fact that Bento was in an extremely vulnerable state, and that Bento was peculiarly susceptible to emotional distress.  In the face of that knowledge, Defendant Graham proceeded to abuse her authority and took outrageous actions that were intended to cause Bento additional emotional distress, or that Defendant Graham knew or should have known would likely result in additional emotional distress for Bento.

107.     As a result of Defendant Graham's conduct, Bento is also entitled to punitive damages.

**COUNT ELEVEN:   NEGLIGENT SUPERVISION (by BENTO Against Defendants City of Milford and DHS)**

108.     Based on the foregoing, Defendants City of Milford and DHS were also negligent in their supervision of Defendant Graham, and Plaintiff Bento was harmed as a result.

109.     Defendants City of Milford and DHS had a duty to properly supervise Defendant Graham and provide Plaintiffs with a reasonably safe working environment.

110.     Defendants breached their duty to properly supervise Defendant Graham by not exercising reasonable care.  Defendants had previously received complaints about inappropriate, abusive, and retaliatory behavior by Defendant Graham against other employees, but Defendants failed to exercise reasonable care and failed to protect other employees, such as Plaintiffs Bento and Dubiel, from further conduct by Defendant Graham in violation of employee rights. Defendants were also negligent by failing to reasonably protect Plaintiffs Bento and Dubiel from

harassment and retaliation by Defendant Graham after they reported such behavior by Defendant Graham to Defendants following the October 2012 letter.

111.    As a result of Defendants' negligence, Plaintiff Bento suffered damages, including, but not limited to, lost wages, lost benefits, emotional distress and loss of enjoyment.

112.    Based on what Defendants knew, or should have known, it was foreseeable that their failure to exercise reasonable care in the supervision of Defendant Graham would result in harm to an employee of the general nature that Plaintiff Bento sustained.

**COUNT TWELVE:  NEGLIGENT SUPERVISION (by DUBIEL Against Defendants City of Milford and DHS)**

113.     Based on the foregoing, Defendants City of Milford and DHS were also negligent in their supervision of Defendant Graham, and Plaintiff Dubiel was harmed as a result.

114.    Defendants City of Milford and DHS had a duty to properly supervise Defendant Graham and provide Plaintiffs with a reasonably safe working environment.

115.    Defendants breached their duty to properly supervise Defendant Graham by not exercising reasonable care.  Defendants had previously received complaints about inappropriate, abusive, and retaliatory behavior by Defendant Graham against other employees, but Defendants failed to exercise reasonable care and failed to protect other employees, such as Plaintiffs Bento and Dubiel, from further conduct by Defendant Graham in violation of employee rights. Defendants were also negligent by failing to reasonably protect Plaintiffs Bento and Dubiel from harassment and retaliation by Defendant Graham after they reported such behavior by Defendant Graham to Defendants following the October 2012 letter.

116.    As a result of Defendants' negligence, Plaintiff Dubiel suffered damages, including, but not limited to, emotional distress and loss of enjoyment.

117.    Based on what Defendants knew, or should have known, it was foreseeable that their failure to exercise reasonable care in the supervision of Defendant Graham would result in harm to an employee of the general nature that Plaintiff Dubiel sustained.

**COUNT THIRTEEN:**      **INTENTIONAL MISREPRESENTATION (by BENTO Against DEFENDANT GRAHAM)**

118.    Defendant Graham also made intentional misrepresentations to Plaintiff Bento, and the State of Connecticut, in which she falsely stated that Plaintiff Bento's dependent children were not eligible for health insurance through her employment with the City of Milford.

119.    When Plaintiff Bento became eligible for health insurance benefits through her employment with Defendants, Defendant Graham falsely represented to Plaintiff Bento that her dependents were not eligible for health insurance through her employment with the City of Milford.  That representation was untrue, and Defendant Graham knew that the representation was not true at the time that she made the statements to Plaintiff Bento.  Defendant Graham made the false statements to Plaintiff Bento in order to induce Plaintiff Bento into acting upon that information.  Plaintiff Bento did take actions in reliance upon those false representations by Defendant Graham, to her injury.

120.    Based upon the misrepresentations by Defendant Graham, Plaintiff Bento undertook other actions to secure health insurance for her children.  Plaintiff Bento maintained health insurance for her son through the State of Connecticut's HUSKY Program.  In connection with maintaining those benefits, Defendant Graham made false representations to the State of Connecticut that Plaintiff Bento's children were not eligible for coverage under the health insurance that Plaintiff Bento received through her employment with Defendants.  Plaintiff Bento had to pay additional out of pocket costs associated with the health insurance and medical treatment received by Plaintiff Bento's children that she would not have incurred if her children

were covered beneficiaries on the health insurance that Plaintiff Bento received through her employment with the City.

121.   Plaintiff Bento subsequently approached Defendant Graham again about adding her children as covered beneficiaries under the health insurance that Plaintiff Bento received through her employment with the City.  At that point, Defendant Graham misrepresented to Plaintiff Bento that her children would only be eligible for health insurance through her employment with the City if Plaintiff Bento changed her status, i.e., became married, because it was not an open enrollment period.  Accordingly, Plaintiff Bento accelerated her plans to marry her then boyfriend, and was forced to marry before a local justice of the peace instead of a more formal and memorable ceremony as she and her husband intended.

## DEMAND FOR RELIEF

Plaintiffs hereby demand Judgment against Defendants, and other relief, including, but not limited to the following:

1.   Compensatory and economic damages, including, but not limited to, lost wages and benefits, emotional distress, and loss of enjoyment.

2.   Attorney's fees and costs.

3.   Statutory and common law punitive damages.

4.   Interest;

5.   Other relief that in law or equity may pertain.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

PLAINTIFFS,
ERICA BENTO & MELISSA DUBIEL

By:_____
     Todd D. Steigman (ct26875)
     Madsen, Prestley & Parenteau, LLC
     402 Asylum Street
     Hartford, CT 06103
     (860) 246-2466 (tel)
     (860) 246-1794 (fax)
     tsteigman@mppjustice.com