UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERICA BENTO and MELISSA DUBIEL,<br>    *Plaintiffs*,<br>        *v.*<br>CITY OF MILFORD and LISA GRAHAM,<br>    *Defendants*. | Civil No. 3:13cv1385 (JBA)<br><br>April 29, 2014 |

**RULING ON PARTIAL MOTION TO DISMISS**

On December 9, 2013, Plaintiffs Erica Bento and Melissa Dubiel filed this employment discrimination action against Defendants City of Milford (the "City") and Lisa Graham, alleging discrimination and retaliation in violation of, *inter alia*, the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Connecticut Fair Employment Practices Act. The City now moves [Doc. # 20] to dismiss counts Eleven and Twelve—Plaintiff Bento's and Plaintiff Dubiel's respective claims for negligent supervision of Defendant Graham by the City—pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for which relief can be granted. For the following reasons, the City's motion to dismiss is granted in part and denied in part.

**I.    Facts**

The Milford Department of Health and Human Services ("DHS") has employed Plaintiff Bento as a community outreach worker since 2008 and Plaintiff Dubiel as a secretary/bookkeeper since 2004. (*See* Am. Compl. [Doc # 19] ¶ 8.) Defendant Graham is the Executive Director of DHS and in that role she has supervisory authority over Plaintiffs. (*Id.* ¶ 5.)

According to Plaintiffs, Defendant Graham "demands the disclosure of private and confidential information from employees, and punishes employees who resist disclosure," "coerces other employees to obtain information about [employees who don't voluntarily disclose such information] and then report back to her so that she can then make use of that information," and turns staff meetings into "group sessions where the personal and private information of employees is shared, sometimes over the objection of the employee involved." (*Id.* ¶ 12; *see also id.* ¶ 10.)  For example, Defendant Graham once demanded that Employee 1 disclose private medical information and subsequently disclosed that information to other employees at DHS. (*Id.* ¶ 10.)  Defendant Graham also subjected Employee 1 to severe verbal abuse, removed Employee 1's job duties, and interfered with Employee 1's ability to work at DHS. (*Id.*)  Defendant Graham would pressure other employees to provide information about Employee 1 and write up statements about Employee 1. (*Id.*)  Defendant Graham would then make other DHS employees edit those statements in accordance with her instructions. (*Id.*)

Additionally, Defendant Graham intercepted a longevity check that Employee 2 had earned while on medical leave and refused to release the money to Employee 2. (*Id.*) Defendant Graham then retroactively terminated Employee 2's employment to a date prior to the date on which the longevity check had accrued. (*Id.*)  Employee 3 has also complained that Defendant Graham's conduct created a hostile work environment. (*Id.*) Defendant Graham carried out these same practices with respect to Plaintiffs.  On one occasion, Defendant Graham told staff members at DHS that Plaintiff Dubeil was hospitalized, had surgery, and was having blood work done. (*Id.* ¶ 12.)  On another occasion, Defendant Graham disclosed private, confidential information regarding serious medical issues suffered by Plaintiff Bento's minor child. (*Id.*)

2

In response to these actions, Plaintiffs sent a series of six letters to various City officials, including the Mayor, in which they complained about Defendant Graham's conduct. (*Id.* ¶ 9.) The first letter, addressed to the City Personnel Director on April 11, 2011, stated that Defendant Graham created "an atmosphere of tension, distrust, and harassment [at DHS]," inaccurately reported statistics to the DHS board and the public, disclosed personal details of staff members to other employees, disclosed employee salaries, benefits and personal financial issues to other employees, failed to maintain client confidentiality, and failed to treat clients in a fair and equal manner. (*Id.* ¶ 13) The letter stated that on one occasion, without Plaintiff Bento's consent, Defendant Graham told all of those in attendance at a DHS meeting that Plaintiff Bento's family was a "Milford working family in need," and that they needed donations from the office. (*Id.*) The City failed to address the problems identified by Plaintiff Bento after receiving this letter, and Defendant Graham's pattern of behavior continued.

The second letter, addressed to the Mayor's assistant on January 29, 2012, alleged that Defendant Graham unlawfully invaded Plaintiff Bento's privacy, demanded that Plaintiff Bento sign a release to give Defendant Graham ability to access confidential and privileged information regarding counseling received by Plaintiff Bento and her family, required disclosure of information regarding Plaintiff Bento's personal affairs to other employees, and screamed at Plaintiff Bento for not explaining what caused her to be hospitalized. (*Id.* ¶ 15). The letter further alleged that in response to Plaintiff Bento telling Defendant Graham that the demand to sign a release made her uncomfortable, Defendant Graham screamed "[a]re you f*cking kidding me?  After all I have done for you; you are not going to do this to me," and then slammed the door and continued screaming and cursing. (*Id.*)

The third letter, addressed to each of the previous two recipients and sent in February 2012, detailed continued invasions of employee privacy rights as well as gender discrimination by Defendant Graham, including that she (1) instructed Plaintiff Bento that she would be fired immediately if she got pregnant, (2) gave Plaintiff Bento inaccurate advice involving her health insurance policy such that Plaintiff Bento felt she had to get married within three days of the advice—which she did—in order to have her children become her beneficiaries, and (3) discriminated against potential clients who received governmental assistance. (*Id.* ¶ 16.)

The fourth letter, written by Plaintiff Dubiel and again addressed to the Mayor's assistant, was dated February 2012 and alleged that Defendant Graham misused city time, made false statements to the Board of Aldermen and the Mayor, discriminated against certain client populations receiving assistance from other government programs, and altered the Board of Directors meeting minutes. (*Id.* ¶ 17.)

The fifth letter, dated April 17, 2012, alleged financial impropriety, fiscal misconduct, misrepresentation of funds, and a toxic and discriminatory environment at the DHS created by Defendant Graham. (*Id.* ¶ 18.) Specifically, Plaintiff Dubiel detailed over $700,000 of funds held in reserve accounts that she alleged Defendant Graham failed to properly disclose when applying for more funding from the City and the Board of Aldermen. (*Id.*)

In May 2012, after the fifth letter was sent, Plaintiff Dubiel met with the Finance Director to address the written complaints. (*Id.* ¶ 19.) In September 2012 Plaintiffs both met with the personnel director for the same reason. (*Id.*) Allegedly, neither meeting led the City to "take any meaningful action to address [Plaintiffs'] issues." (*Id.*) In October 2012 Plaintiffs sent the sixth and final letter directly to the Mayor, which "detailed and

4

amplified Plaintiffs' previous complaints to the City regarding Defendant Graham's conduct." (*Id.* ¶ 20.)

After this final letter was sent directly to the Mayor, Defendants developed a "consistent pattern of harassment and retaliation against Plaintiffs." (*Id.* ¶ 21.) Defendant Graham became very upset with Plaintiffs and clearly communicated to City officials that she wanted Plaintiffs removed from their positions. (*Id.* ¶ 22.) Additionally, Plaintiffs claim that they were treated less favorably than other employees following the letters. (*Id.* ¶ 23.) Specifically, Defendant Graham subjected Plaintiffs to hyperscrutiny, arranged for other employees to monitor Plaintiffs when she was not at the office, searched Plaintiffs' desks, logged into their computers and email accounts, sent numerous harassing electronic communications to Plaintiffs, discussed their complaints in a disparaging way with members of the community, and "poisoned" Plaintiffs' relationships with other staff members. (*Id.*) Further, Plaintiff Bento contends that despite Defendants having knowledge of Plaintiff Bento's susceptibility to anxiety and stress, Defendant Graham has caused her to "suffer a series of panic attacks at work since the delivery of the October 2012 letter," which on occasion have caused her to miss work. (*Id.* ¶ 27.) The City hired an outside lawyer to conduct an investigation into Plaintiffs' claims, but Plaintiffs allege that Defendant Graham, knowing the lawyer was coming, coordinated with staff in the office about the statements they would give. (*Id.* ¶ 25.)

On several occasions after the letters had all been sent, Defendant Graham subjected Plaintiff Bento to two-on-one "interrogations," which were essentially meetings where Defendant Graham would bring a subordinate employee to take notes. (*Id.* ¶¶ 28, 32.) After the first "interrogation" Plaintiff Bento notified the Mayor, through Plaintiffs' counsel, that Graham was "engaging in harassment and retaliation against [Plaintiff]

5

Bento, which was causing her 'emotional trauma.'" (*Id.* ¶ 29.) Also after this first "interrogation" Plaintiff filed discrimination and retaliation charges with the Commission on Human Rights and Opportunities asserting claims under both the Connecticut Fair Employment Practices Act and Title VII of the Civil Rights Act of 1964. On another occasion, about which she notified the City, another two-on-one "interrogation" caused Plaintiff Bento to have a panic attack that required her to be hospitalized. (*Id.* ¶ 33.) During these meetings Plaintiff alleges that Defendant Graham and the note-taking employee would meet prior to the meeting and then again afterwards for the purpose of typing and editing the notes from the meeting and destroying the handwritten notes. (*Id.* ¶ 31.)

Subsequent to the meeting that caused the panic attack, Plaintiff Bento requested that Defendants adopt reasonable accommodations for her condition "so that she would not continue to be placed in situations at work by Defendant Graham that caused her to suffer panic attacks." (*Id.* ¶ 34.) One of these accommodations included a request to report to another supervisor, which was denied. (*Id.* ¶¶ 35, 36.) Plaintiff Bento also requested that, if the City needed documentation of her meetings with Defendant Graham, that the meetings be videotaped so that the third person wouldn't need to be present and so that the notes wouldn't have to be edited, but this request was also denied. (*Id.* ¶¶ 36–38.)

In April 2013, upon request from the City, Plaintiff Bento provided the City with a letter from her doctor supporting her requests for reasonable accommodation. (*Id.* ¶¶ 39, 40.) The letter specifically supported her request to videotape the meetings or, in the alternative, to leave the door open during those meetings. (*Id.* ¶ 40.) Despite the letter, Plaintiff Bento's requests for accommodation were still denied. (*Id.* ¶ 41.) Further,

despite the doctor's request, Defendant Graham continued to use a tone of voice in the meetings that was confrontational and/or threatening. (*Id.* ¶¶ 40, 43.) After the denial of these requests Plaintiff Bento again suffered a panic attack during a two-on-one meeting with Defendant Graham and a subordinate. (*Id.* ¶ 44.) As a result, she returned to her doctor, who placed her on one month of Family Medical Leave. (*Id.* ¶ 45.) Plaintiff Dubiel "also needed to take medical leave as a result of the harassment and retaliation by Defendants." (*Id.*) Both women "needed to deplete their accrued vacation, personal, and sick time, and also were unable to accrue additional vacation, personal, and sick time." (*Id.*)

Plaintiff Bento also claims that she was subjected to harassment and retaliation in the context of her appointment to a joint initiative organized by the Red Cross, the Salvation Army and the City. (*Id.* ¶ 46.) Plaintiff Bento was originally supposed to report to Mr. Tom Ivers with respect to her work on this initiative, but Defendant Graham altered this reporting structure to ensure "that [Plaintiff] Bento reported directly to her in connection with her performance." (*Id.*) In the course of reporting to Defendant Graham, Plaintiff Bento claims that "[Defendant] Graham has also asserted control over [Plaintiff] Bento's meetings and schedules relating to the . . . position in a way that is unlike her treatment of any other person under her supervision," which has "ma[d]e it difficult for [Plaintiff] Bento to succeed in this role." (*Id.*) Plaintiff Bento has received no relief from the Mayor's office in this position either, despite filing further complaints about Defendant Graham. (*Id.* ¶ 48.)

**II.     Discussion**[1]

The City moves to dismiss counts Eleven and Twelve of the Amended Complaint, which allege negligent supervision of Defendant Graham by the City, arguing that it is entitled to immunity on these claims. "Under Connecticut law, an employer may be held liable for the negligent supervision of employees." *Gutierrez v. Thome*, 13 Conn. App. 493, 500 (1988); *see also Roberts v. Circuit-Wise, Inc.*, 142 F. Supp. 2d 211, 214 (D. Conn. 2001) ("[In a negligent supervision action, the [p]laintiff must plead and prove that she suffered an injury due to the defendant's failure to supervise an employee whom the defendant had [a] duty to supervise. A defendant does not owe a duty of care to protect a plaintiff from another employee's tortious acts unless the defendant knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct.") (citing *Shanks v. Walker*, 116 F. Supp. 2d 311, 314 (D. Conn. 2000)). Although the City acknowledges that a private cause of action for negligent supervision exists under Connecticut law as a general matter, it argues that as a municipality, it is entitled to governmental immunity with respect to Plaintiffs' negligent supervision claims pursuant to Conn. Gen. Stat. § 52-557n.

Section 52-557n provides, in relevant part:

> Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or

---

[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

>discretion as an official function of the authority expressly or impliedly granted by law.

Pursuant to § 52-557n, if the City's supervision of Defendant Graham was ministerial in nature, then the City is not entitled to governmental immunity, but if its supervision of Defendant Graham was discretionary, then governmental immunity bars Plaintiffs' claims unless they can show that they fall into one of the recognized exceptions to governmental immunity. *See, e.g., Gauvin v. New Haven*, 187 Conn. 180, 184 (1982) ("A municipality is immune from liability for the performance of governmental acts as distinguished from ministerial acts. Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature . . . .").

In *Martel v. Metropolitan District Commissioner*, the Connecticut Supreme Court noted that "[o]ur case law reveals that the determination of whether an act or omission is discretionary in nature and, thus, whether governmental immunity may be successfully invoked pursuant to § 52–557n (a)(2)(B), turns on the character of the act or omission complained of in the complaint." 275 Conn. 38, 49–50 (2005). Here, Plaintiffs allege in the Amended Complaint that the City failed to intervene or discipline Defendant Graham after receiving complaints about her conduct. Courts in this state have previously recognized that "considerations of who to hire, how to train such people, and how to supervise employees are decisions requiring the use of judgment and discretion." *Gervais v. Town of West Hartford Bd. of Educ.*, 17 Conn. L. Rptr. 383, 1996 WL 456370, at *4 (Conn. Super. Ct. July 31, 1996). Although Plaintiffs' claims arise from the City's complete lack of training or supervision, rather than from insufficient training or supervision, the City's decision to grant Defendant Graham autonomy with respect to her management of subordinate employees, and the City's failure to intervene in the face of

9

multiple complaints, were similarly based on an exercise of judgment that no intervention or supervision was warranted. Therefore, the City is entitled to immunity with respect to Plaintiff's negligent supervision claims unless Plaintiffs can show that they fall into one of the recognized exceptions to governmental immunity.

There are three identified exceptions to governmental immunity in Connecticut. *Evon v. Andrews*, 211 Conn. 501, 505 (1989). Plaintiffs argue that the first of these exceptions—"where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm," *id.* (citing *Sestito* v. *Groton*, 178 Conn. 520, 528 (1979))—is applicable in this case. *See Grady v. Town of Somers*, 294 Conn. 324, 348 (2009) (holding that the identifiable person-imminent harm exception applies to direct actions against a municipality under § 52-557n). "Foreseeability is the touchstone of [the] analysis in determining whether a public officer can be liable for his discretionary acts under [the identifiable person-imminent harm] exception." *Fleming v. Bridgeport*, 284 Conn. 502, 532 (2007) (citing *Durrant v. Board of Education*, 284 Conn. 91, 101 (2007)).

In order for the identifiable person-imminent harm exception to apply, Plaintiffs must allege: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. All three of these factors are intimately tied to the question of foreseeability, and all must be met for a plaintiff to overcome qualified immunity." *Id.* at 533 (internal citations and quotation marks omitted). "Because the three requirements for [the identifiable person-imminent harm] exception are analyzed conjunctively, the plaintiff's failure to establish . . . one requirement mean[s] that [a court does] not reach the other two." *Doe v. Peterson*, 279 Conn. 607, 620 (2006). In addition to these three requirements, courts in this state

have also held that the imminent harm complained of must be physical in nature in order for the exception to apply.  *See, e.g.*, *Celotto v. Brady*, CV065003279, 2008 WL 231331, at *11–12 (Conn. Super. Ct.  May 15, 2008); *Pane v. Danbury*, 33 Conn. L. Rptr. 377, 2002 WL 31466332, at *9 (Conn. Super. Ct. Oct. 18, 2002) *aff'd*, 267 Conn. 669 (2004).  The City argues that Plaintiffs have failed to allege sufficient facts in support of any of these requirements and that therefore the identifiable person-imminent harm exception is inapplicable in this case.

Specifically, the City argues, citing *Celotto* and *Pane*, that because the harm alleged in this case was not inflicted through physical actions, it is not "physical harm" within the meaning of the exception.  In *Celotto*, the plaintiff was terminated from her position as a secretary at Amity High School "for failing to properly manage and control the student activity fund." *Id.* at *2.  After looking at numerous Connecticut appellate cases, the court noted that "[w]hile none of the[] appellate cases were decided on the basis of a physical/non-physical harm distinction, [it is] notable that all of them involved allegations of physical harm." *Id.* at *11.  The court also noted that "the Superior Court cases based on the reasoning of *Pane v. Danbury*, holding that evidence of physical harm is required to claim the exception, are highly persuasive and correlate with the most recent appellate court decisions. *Id.* at *12.

In *Pane*, the plaintiff was hired as public health inspector.  Without notification, another employee at Pane's workplace granted a newspaper reporter's request to access the plaintiff's personnel file, and the reporter subsequently wrote two highly critical articles. *Id.* at *1.  Plaintiff sued, alleging, *inter alia*, negligent infliction of emotional distress. *Id.* at *8.  The court reasoned that the "failure to notify the plaintiff of Hamilton's request did not *result* in physical harm," and thus could not fit within the

identifiable person-imminent harm exception. *Id.* at *9 (emphasis added). Thus, neither of these cases supports the proposition that harm must be physically inflicted to fall within the exception. To the contrary, in *Pane*, the court specifically noted that physical harm did not *result* from the defendant's actions, implying that the harm *suffered* must be physical, rather than implying that the infliction itself is the focus of the inquiry.

The City next argues that even if the identifiable person-imminent harm exception does not require the physical infliction of harm, Plaintiffs' claims still fail because they have not alleged that they suffered any physical harm. Plaintiffs counter that they have alleged that they suffered physical harm in that Plaintiff Bento suffered panic attacks and Plaintiff Dubiel needed to take medical leave as a result of Defendant Graham's harassment. Most of the cases to discuss the physical harm requirement do not address what constitutes "physical" harm. *See, e.g.*, *Chipperini v. Crandall*, 253 F. Supp. 2d 301, 312 (D. Conn. 2003) ("Although this exception to governmental immunity is not well developed in Connecticut law it appears that the type of harm required is physical harm or personal danger, not the results of a wrongful arrest."); *Doe v. Bristol Bd. of Ed.*, No. CV065002257, 2007 WL 1053836 (LPP) (Conn. Super. Ct. Mar. 23, 2007)("[I]t is not necessary on these facts to determine whether the plaintiff must have suffered physical injury."); *D'Agostino v. Orange*, No. CV054011875S, 2006 WL 1320597 (BWT) (Conn. Super. Ct. Apr. 7, 2006)("[B]ecause the plaintiff has not alleged that he suffered physical harm as a result of the defendants' alleged negligent acts, the imminent harm exception is inapplicable to the plaintiff's claims."); *Rosetti v. Middlefield*, No. CV010452129S, 2004 WL 1157401 (Conn. Super. Ct. May 11, 2004)("The applicable case law applies the 'imminent harm' exception to personal injury cases involving physical harm."). However, in *Celotto*, the court held that an allegation of "emotional distress so severe that

physical illness could result" did not actually plead any physical harm. *Id.* at *12. Thus, absent some concrete manifestation of physical symptoms, Plaintiffs' claims fail to fall into the identifiable person-imminent harm exception.

In the Amended Complaint, Plaintiff Bento alleges that she suffered several panic attacks as a result of Defendant Graham's behavior. (Am. Compl. ¶¶ 33, 44.) Panic attacks are typically accompanied by many physical manifestations, including "chest pain . . . dizziness . . . nausea . . . shortness of breath . . . [and] trembling or shaking." Mark H. Beers & Robert Berkow, *The Merck Manual of Diagnosis and Therapy* (17th ed. 1999). Thus, Plaintiff Bento has alleged minimally sufficient facts to support the inference that she suffered physical harm as a result of Defendant Graham's actions. *Cf. Peck v. Public Service Mut. Ins. Co.*, 363 F. Supp. 2d 137, 144 (D. Conn. 2005) (holding that sleeplessness constitutes a physical manifestation of emotional distress that can constitute a bodily injury under the terms of a homeowner's insurance policy). However, although Plaintiffs claim in their briefing that Plaintiff Dubiel's distress likely included physical manifestations (Pls.' Opp'n [Doc. # 23] at 9), the Amended Complaint is completely devoid of any allegation of physical symptoms or consequences suffered by Plaintiff Dubiel. Therefore, she is not covered by the identifiable person-imminent harm exception, and the City is entitled to governmental immunity on her negligent supervision claim. The City's motion to dismiss Plaintiff Dubiel's negligent supervision claim in Count Twelve is thus granted.

The City argues that even if Plaintiff Bento suffered physical harm, she has failed to plead sufficient facts to show that the harm she suffered was "imminent" within the meaning of the exception. "Imminent harm is harm ready to take place within the immediate future. Imminent is defined as something about to materialize of a dangerous

13

nature. Imminent harm excludes risks which might occur, if at all, at some unspecified time in the future." *Stavrakis v. Price*, No. CV106001285S, 2010 WL 3961294 at *3 (Conn. Super. Ct. Sept. 7, 2010). In *Stavrakis* the plaintiffs brought a claim against volunteer firemen, the New Milford fire marshal, and the town of New Milford based on "alleged untruths and falsehoods concerning a particular fire that occurred in New Milford on the plaintiff's premises." *Id.* at 1. In finding that the identifiable victim-imminent harm exception did not apply, the court pointed to the fact that the untruths and falsehoods spanned six days as evidence that any harm resulting from them could not have been "imminent" within the meaning of the exception. *Id.* at *3.

Similarly, in *Evon v. Andrews*, the court reasoned that "[t]he gravamen of the plaintiffs' allegations [was] that the defendants had not done enough to prevent the occurrence of a fire. The risk of fire implicates a wide range of factors that can occur, if at all, at some unspecified time in the future." 211 Conn. at 507–08. Because of the uncertain time period in which the harm complained of could have occurred, the court found that the risk of harm was not imminent. *Id.* In *Evon*, the court distinguished *Sestito v. Groton*, 178 Conn. 520 (1999), in which a police officer failed to intervene in an ongoing fight until he heard gunshots. In that case, the court determined that the defendant was not entitled to a directed verdict on the issue of governmental immunity. *Evon*, 211 Conn. at 507. Thus, a review of the case law indicates that a particularized risk of a nearly contemporaneous harm is required for a claim to fall within the identifiable person-imminent harm exception.

However, it bears noting that none of the cases addressing this exception deal with the employment context applicable in the present case. Here, Plaintiff Bento has alleged that the City had notice of Defendant Graham's propensity to retaliate through her

numerous complaints, and had specific knowledge of Defendant Graham's animosity towards Plaintiff Bento in that she expressed a desire for Plaintiff Bento to be terminated. (Am. Compl. ¶ 22.) Furthermore, Plaintiff Bento has alleged that she notified the City that Defendant Graham's two-on-one "interrogations" had caused her to suffer a panic attack and requested accommodations, supported by a doctor's note, in order to avoid the possibility of suffering additional attacks in future two-on-one meetings. (*Id.* ¶¶ 33–41.) Thus, when the City denied Plaintiff Bento's requested accommodations, it knew that there was a medically recognized risk that Plaintiff Bento would suffer a panic attack in a future two-on-one meeting. Although the City did not know with certainty the exact date and time of the next two-on-one meeting, it could be certain that Defendant Graham and Plaintiff Bento, both full-time employees, would hold such a meeting in the near future. Therefore, Plaintiff Bento has alleged minimally sufficient facts to satisfy the imminence requirement of the identifiable person-imminent harm exception. For the same reasons, Plaintiff Bento has alleged sufficient facts to show that she was an "identifiable person" within the meaning of the exception. Consequently, Plaintiff Bento has pled sufficient facts to satisfy the elements of the identifiable person-imminent harm exception, and the City is not entitled to governmental immunity on her negligent supervision claim at this stage. The City's motion to dismiss Count Eleven is thus denied.

### III. Conclusion

For the reasons set forth above, the City's Motion [Doc. # 20] to Dismiss is DENIED with respect to Plaintiff Bento's negligent supervision claim in Count Eleven and GRANTED with respect to Plaintiff Dubiel's negligent supervision claim in Count Twelve.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of April, 2014.