UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ERICA BENTO, and     :
MELISSA DUBIEL,      :
Plaintiffs,        :
            :   CIVIL CASE NO.
vs.          :   3:13-CV-01385 (VAB)
            :
CITY OF MILFORD and    :
LISA DIAMOND GRAHAM,   :
Defendants.       :


## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Erica Bento and Melissa Dubiel (together "Plaintiffs") have brought this action against their former employer, the City of Milford ("the City"), and their former supervisor, Ms. Lisa Diamond Graham (together "Defendants").  In their Second Amended Complaint against Defendants, Ms. Bento and Ms. Dubiel allege various federal claims as well as claims under Connecticut law, relating to their employment with the City under Ms. Graham's supervision.

Ms. Bento and Ms. Dubiel each allege that Defendants violated Title VII of the Civil Rights Act of 1964 by retaliating against them for making protected complaints against Ms. Graham during the course of their employment (Counts Fourteen-Fifteen).  Second Am. Compl. ¶¶ 147-156, ECF No. 57.  Ms. Bento also brings the following additional federal claims: violations of the Due Process Clause of the Fourteenth Amendment and privacy-related rights pursuant to 42 U.S.C. § 1983 (Count One); discrimination under the Americans with Disabilities Act ("ADA") (Count Sixteen); and interference with medical leave in violation of the Family and Medical Leave Act ("FMLA") (Count Seventeen). *Id*. at ¶¶ 80-85, 157-173.

Plaintiffs also bring various claims under Connecticut law.  Ms. Bento and Ms. Dubiel each allege three separate state law retaliation claims under Conn. Gen. Stat. § 31-51q (Counts

Two-Three), Conn. Gen. Stat. § 31-51m (Counts Four-Five), and the Connecticut Fair

Employment Practices Act ("CFEPA") (Counts Six-Seven). *Id*. at ¶¶ 86-115.  Ms. Dubiel also

brings a separate claim of retaliation under Conn. Gen. Stat. § 31-290a (Count Eight) alleging

that the City retaliated against her for bringing a worker's compensation claim. *Id*. at ¶¶ 116-121.

Finally, Ms. Bento separately brings a disability discrimination claim against the City under

CFEPA (Count Nine), claims of Intentional Infliction of Emotional Distress (Count Ten) and

Fraudulent Misrepresentation (Count Thirteen) against Ms. Graham; and a claim of Negligent

Supervision against the City (Count Eleven).  *Id*. at ¶¶ 122-141, 143-146.

For the reasons set forth below, Defendant's Motion for Summary Judgment is

**GRANTED** with respect to all federal claims.  The Court declines to exercise supplemental

jurisdiction over the remaining state law claims.

## I.   FACTUAL SUMMARY

The following facts are undisputed by the parties.

The City previously employed Erica Bento as a full-time community outreach worker,

and Melissa Dubiel as a secretary and bookkeeper.  L.R. 56(a)(1) ¶¶ 2-3, ECF No. 84-2.  Since

2007, the City employed Lisa Diamond Graham as the Executive Director of the Department of

Human Services ("DHS").  L.R. 56(a)(2) ¶ 5, ECF No. 101-1.  In that role, Ms. Graham served

as the direct supervisor for both Ms. Bento and Ms. Dubiel.  *Id*. at ¶ 4.

### A.   2010 Incident Regarding Health Insurance Coverage

When Ms. Bento began work with the City, Ms. Graham informed Ms. Bento that her

dependents would not be eligible for health insurance coverage.  *Id*. at ¶ 10.  When Ms. Bento's

daughter needed certain medical testing in 2010, Ms. Bento asked Ms. Graham how she could

get medical coverage for her daughter, and Ms. Graham informed her that "open enrollment" had

already concluded and Ms. Bento needed a qualifying event, such as getting married, in order to

enroll in health insurance coverage for her daughter.  *Id.* at ¶¶ 11-12; Bento Dep. 90, 109-111,

Def. Ex. C, ECF No. 84-7.  Ms. Bento contacted then-Mayor James Richetellito to discuss the

issue of health insurance coverage for her daughter, and he informed Ms. Bento that Ms.

Graham's assessment of the situation was "not the case."  L.R. 56(a)(2) ¶ 12; Def. Ex. C at 111.

The City arranged to discuss the issue of health insurance coverage for Ms. Bento at the

upcoming meeting of the Board of Aldermen; however, following Ms. Graham's advice, Ms.

Bento got married to her boyfriend at the time in order to ensure that she obtained medical

coverage for her daughter.  L.R. 56(a)(2) ¶¶ 16-18; Def. Ex. C at 111.  At Ms. Graham's request,

the City subsequently approved a budget allocation to provide health insurance coverage to Ms.

Bento's daughter.  L.R. 56(a)(2) ¶ 17.

### B.   Written Complaints against Ms. Graham and the City's Investigation

During the course of their employment with the City, Ms. Bento and Ms. Dubiel filed

numerous complaints with the City.  Apr. 2011 Compl., Def. Ex. K, ECF No. 84-15; Jan. 2012

Compl., Def. Ex. R, ECF No. 85-7; Dubiel Feb. 2012 Compl., Def. Ex. S, ECF No. 85-8; Bento

Feb. 2012 Compl., Def. Ex. V, ECF No. 85-11; Apr. 2012 Compl., Def. Ex. W, ECF No. 85-12.

In each of these complaints, they alleged various types of misconduct on the part of Ms. Graham.

### 1.   Ms. Bento's April 2011 Complaint

In April of 2011, Ms. Bento filed a complaint with the City's Personnel Director, John

O'Connell, describing an "unprofessional work environment" under Ms. Graham's leadership.

Def. Ex. K.  Ms. Bento specifically alleged that Ms. Graham had a practice of requesting and

disclosing detailed information pertaining to the personal lives of employees, including requiring

specific explanations when employees needed to take time off and openly discussing employee

salaries in the office.  *Id.*  Ms. Bento complained of a specific instance in which Ms. Graham

identified Ms. Bento as a "Milford working family in need" during a staff meeting around the

holidays, resulting in personal embarrassment to Ms. Bento.  *Id.*  Her complaint also alleged that

Ms. Graham regularly expressed favoritism among individual employees, reported inflated DHS

statistics to her superiors, used Ms. Bento's participation in board meetings to "create conflict"

among different agencies, and made misrepresentations at a meeting of the Board of Aldermen

that she would be forced to cut Ms. Bento's position if she did not receive funding for health

insurance benefits.  *Id.*; L.R. 56(a)(1) ¶¶ 20-32.

### 2.   Ms. Bento's January 2012 Complaint

In January of 2012, Ms. Bento made another complaint to Steven Fournier, who was

serving as Assistant to the Mayor.  Jan. 2012 Compl., Def. Ex. R, ECF No. 85-7.  In this

complaint, Ms. Bento described an incident that took place after Ms. Bento left work for lunch

on January 20, 2012 and did not return until 4:30 p.m.  *Id.*  When Ms. Bento returned to the

office in the late afternoon, she explained to Ms. Graham that she had gone to the courthouse to

obtain a protective order against the father of one of her children.  Records of text

communications between Ms. Bento and Ms. Graham from that evening reflect that the two were

in communication about this incident outside of work hours and that Ms. Bento expressed

gratitude for Ms. Graham's support.  Bento Text Message Tr., Def. Ex. O, ECF No. 85-3.

The January 2012 complaint alleges that three days later, on January 23, 2012, Ms.

Graham called Ms. Bento into her office and requested that Ms. Bento sign a release allowing

Ms. Graham to speak with Ms. Bento's family therapist about what was going on.  Def. Ex. R.

Ms. Bento refused.  *Id.*  Ms. Graham subsequently called a staff meeting during which she

disclosed details pertaining to Ms. Bento's protective order.  *Id.*; L.R. 56(a)(1) ¶¶ 39-40.  Ms.

Bento reports that she went to the hospital after that staff meeting, and she did not come to work the following day, January 24, 2012.  Def. Ex. R.  When she returned to work on January 25, 2012, Ms. Graham asked her what happened.  *Id.*  Ms. Bento told her that she was not comfortable discussing anything personal in the office, to which Ms. Graham responded with an expletive. *Id.*

### 3.    Ms. Dubiel's February 2012 Complaint

In February of 2012, Ms. Dubiel submitted a written complaint to Stephen Fournier detailing similar allegations as those contained in Ms. Bento's April 2011 complaint.  Dubiel Feb. 2012 Compl., Def. Ex. S, ECF No. 85-8.  In addition to alleging that Ms. Graham regularly shared personal information pertaining to office employees, Ms. Dubiel also alleged that Ms. Graham was careless about protecting client confidentiality when discussing matters in the office, altered meeting minutes and inflated statistics in her reporting, and used "double standards" regarding the distribution and use of "comp" time by allowing more flexibility with favored employees.  *Id.*

In her complaint, Ms. Dubiel also described an incident in December 2011 when she took some time off from work due to a medical issue.  *Id.*  Text message records from that time reflect that Ms. Dubiel volunteered detailed and specific information about her condition to Ms. Graham via text message when requesting time off.  Dubiel Text Message Tr., Def. Ex. N, ECF No. 85-2. Ms. Dubiel's complaint alleged that Ms. Graham shared details about Ms. Dubiel's medical issue with others in the office during her absence, causing embarrassment to Ms. Dubiel.  Def. Ex. S.

### 4.    Ms. Bento's February 2012 Complaint

Ms. Bento submitted another written complaint to John O'Connell in February 2012, detailing allegations similar to those previously described regarding the work environment under

5

Ms. Graham's leadership.  Bento Feb. 2012 Compl., Def. Ex. V, ECF No. 85-11.  This complaint

also described an incident in which Ms. Graham publicly told Ms. Bento that if Ms. Bento ever

got pregnant, she would be fired.  *Id*.  Ms. Bento was not pregnant at the time, and was never

terminated from her position.  The complaint further alleged that Ms. Graham was

discriminatory in her treatment of DHS clients based on other programs they received, such as

Section 8.  *Id*.

### 5.  April 2012 Complaint, October 2012 Letter, and CHRO/EEOC Complaints

In April of 2012, Ms. Bento and Ms. Dubiel submitted a final written complaint to the

City detailing similar allegations and describing both "financial impropriety" on the part of Ms.

Graham and a "toxic environment" under her leadership.  Apr. 2012 Compl., Def. Ex. W, ECF

No. 85-12.  This final complaint led to a meeting with the City's attorney, Debra Kelly, as well

as with the City's Personnel Director Mr. O'Connell.  L.R. 56(a)(1) ¶¶ 54-55.

Following this meeting, Plaintiffs' counsel submitted a letter to current Mayor Benjamin

Blake on October 1, 2012 referencing all five of these complaints and generally asserting that

Bento and Dubiel were subjected to "harassment" for complaining about Ms. Graham's conduct.

Pl. Letter, Def. Ex. Z, ECF No. 85-15.  The letter also described their intention to initiate legal

proceedings if no action was taken by the City.  *Id*.  The City subsequently hired counsel and

initiated an investigation into their allegations, resulting in a detailed report addressing each of

the accusations against Ms. Graham.  Investigative Report, Def. Ex. Q, ECF No. 85-6.

Dissatisfied with the City's response, Ms. Bento and Ms. Dubiel filed charges with the

Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal

Employment Opportunity Commission ("EEOC") in December 2012 asserting CFEPA and Title

VII claims.  CHRO Complaints, Def. Ex. PPP, ECF No. 88-7.  Ms. Bento also filed a separate

6

complaint with the CHRO and EEOC in July 2013 under the ADA, as well as an additional complaint in August 2014 after the commencement of this lawsuit.  *Id.*

### A.    Allegedly Retaliatory Acts

Ms. Bento and Ms. Dubiel both allege that in the wake of the five written complaints, the October 2012 letter and the initiation of the investigation against Ms. Graham, Ms. Graham took various retaliatory actions against them which the City failed to prevent.  Second Am. Compl. ¶¶ 31-49.  They both admit that they were never terminated from their respective positions, they were never formally demoted, and their pay was never reduced; however, they claim that Ms. Graham took retaliatory actions against them that negatively impacted their employment with the City and ultimately required them to take medical leave and eventually resign from their positions.  *Id*. at ¶¶ 44, 54-55, 77.

### 1.    Alleged Employer Actions as to Ms. Dubiel

Ms. Dubiel alleges that Defendants took several actions against her in retaliation for her various complaints.  Specifically, Ms. Dubiel alleges that, after receiving the October 2012 letter from her and Ms. Bento's attorney describing the various complaints in which Ms. Dubiel was involved, Ms. Graham increased her monitoring of Ms. Dubiel's work, "demanded that Ms. Dubiel copy her on external communications," and removed Ms. Dubiel from participation in various community programs such as the "Family Fun Night" and the "Thanks for Giving" program.  L.R. 56(a)(2) ¶¶ 162-155.  Ms. Dubiel also claims that the City requested excessive medical documentation when she took multiple absences from work in October 2013.  L.R. 56(a)(2) ¶¶ 184-185.  Ms. Dubiel never returned to work, and she formally resigned from her position in January of 2014.  L.R. 56(a)(1) ¶ 97.

### 2.   Alleged Employer Actions as to Ms. Bento

Ms. Bento also alleges that a variety of retaliatory actions were taken against her.  After Ms. Graham was notified about Plaintiffs' complaints, Ms. Graham began including a third-party scrivener at all in-person meetings between herself and Ms. Bento.  L.R.  56(a)(1) ¶ 57. According to Ms. Bento, this third party was a "subordinate employee" who was "loyal" to Ms. Graham and hostile to Ms. Bento.  Second Am. Compl. ¶¶ 28, 31.  Ms. Bento alleges that this employee would meet with Ms. Graham before and after the meetings to discuss the meeting and to edit the notes.  *Id*.  These "two-on-one" meetings caused Ms. Bento significant anxiety.  *Id*.

In November 2012, Ms. Bento was invited by the Mayor to join the City's Long Term Recovery Task Force ("Task Force") in the wake of Hurricane Sandy.  L.R. 56(a)(1) ¶ 58.  Ms. Graham opposed Ms. Bento's appointment, and Ms. Graham met with the Mayor and Mr. Fournier to recommend that Ms. Bento be removed from the Task Force.  *Id*.  Later that month, on Friday November 30, 2012, Ms. Graham met with Ms. Bento regarding her participation in the Task Force meetings.  *Id*. at ¶ 60.  During that conversation, Ms. Graham called in additional employees to discuss Ms. Bento's participation on the Task Force.  L.R. 56(a)(2) ¶ 60.  Ms. Bento felt confronted and attacked by Ms. Graham during that meeting and she had a panic attack, which caused her to miss work for the remainder of the day as well as a full day of work on Monday, December 3rd.  *Id*.  The City never removed Ms. Bento from the Task Force.  *Id*. at ¶ 61.

Ms. Bento had additional anxiety attacks during other encounters with Ms. Graham, resulting in Ms. Bento taking time off work.  One such encounter arose from an incident on July 8, 2013, when Ms. Bento made the comment "I don't do ghetto" during a work meeting at the American Red Cross building in Milford.  L.R. 56(a)(1) ¶ 69.  Two days later, Ms. Graham

called a meeting with Ms. Bento to discuss the comment; according to Ms. Bento, the meeting turned into a confrontation about the presence of a third-party note-taker at meetings between Ms. Bento and Ms. Graham.  L.R. 56(a)(2) ¶ 70.  Following that meeting, Ms. Graham issued Ms. Bento a written warning, and Ms. Bento left work for the rest of the day and remained out of the office on FMLA leave from July 10 until September 3, 2013.  *Id*. at ¶ 71; Bento-Graham E-mails 7/10/2013, Def. Ex. FF, ECF No. 86-6.

When Ms. Bento returned from leave in September 2013, she was assigned to work out of a separate office in a building operated by the American Red Cross for three days of the week due to a temporary assignment as a "Disaster Case Manager."  Bento Dec. at ¶ 71, Pls. Ex. 4, ECF No. 101-2; L.R. 56(a)(1) ¶ 72.  On Ms. Bento's first day in that office, she called Ms. Graham, stating that she had not been provided with an adequate workspace.  L.R. 56(a)(1) ¶ 73. In response, Ms. Graham reached out to other individuals at the City to address Ms. Bento's concerns.  *Id.*  Ms. Bento alleges that during her time at the Red Cross office, Ms. Graham subjected her to disproportionate scrutiny and "micromanage[d]" her activities with respect to this role.  Pls. Ex. 4 at ¶ 73.

In February 2014, after Ms. Bento and Ms. Dubiel initiated this lawsuit, Ms. Bento was scheduled to participate in a conference call with Ms. Graham and another City employee.  *Id.* at ¶ 75.  On February 10, 2014, Ms. Graham instructed Ms. Bento to come to the DHS office in order to participate in the call and Ms. Bento responded by e-mail stating that she was "not comfortable driving in this weather" and would prefer to stay at the Red Cross office.  Bento-Graham E-mails 2/10/2014, Def. Ex. LL, ECF No. 86-11.  When Ms. Graham indicated that the weather should be clear by the time of the conference call, Ms. Bento responded by stating that she felt Ms. Graham was "forcing" her to participate in the call in order to "harass" and

"intimidate" her.  *Id*.  The call was eventually cancelled, and Ms. Graham arranged for a follow-up meeting with Ms. Bento the next day, February 11, 2014, to discuss Ms. Bento's refusal to attend the conference call at the DHS office.  L.R. 56(a)(1) ¶ 77.

The meeting was rescheduled from the morning to the afternoon because Ms. Bento reported severe anxiety and vomiting in advance of the original meeting time.  L.R. 56(a)(2) ¶ 78.  Ms. Bento had her counsel present with her when she attended the meeting on the afternoon of February 11, 2014.  *Id*.  However, after the meeting Ms. Bento informed Ms. Graham that she would not be returning to work and she initiated another period of FMLA leave on that day.  *Id*. at ¶ 79.  Ms. Graham issued Ms. Bento a written reprimand stating that Ms. Bento's e-mail communications to Ms. Graham on February 10, 2014 "rose to the level of insubordination" and reminding Ms. Bento that she was expected to participate in meetings with her supervisor and with other City employees as needed.  Written Reprimand, Def. Ex. PP, ECF No. 87-3.

### D.  Ms. Bento's FMLA Leave in February – March 2014

When Ms. Bento initiated FMLA leave on February 11, 2014, the City's Personnel Director Tania Barnes requested that Ms. Bento complete a Certificate of Health Care Provider form.  L.R. 56(a)(1) ¶ 81.  Ms. Bento had the certification signed by her primary care physician, Dr. Tracy, dated February 14, 2014.  *Id*.  On the certification, Dr. Tracy described Ms. Bento as being a patient "under care of psychiatrist and therapist."  Tracy Certification, Def. Ex. RR, ECF No. 90-6.  In light of the psychiatric nature of the problems that led to Ms. Bento's FMLA leave, Ms. Barnes requested that a new certification be completed by Ms. Bento's treating psychiatrist, Dr. Richard Yun.  L.R. 56(a)(1) ¶ 83.  Ms. Barnes further specified that Ms. Bento would need to provide documentation from her "treating psychiatrist" that she would safely be able to perform her job duties at the conclusion of her leave.  Barnes E-mail 2/25/2014, Def. Ex. SS, ECF No.

90-7.  On March 3, 2014, Ms. Bento submitted a certification signed by a licensed social worker, and on March 4, 2014, as requested, she submitted a certification signed by her treating psychiatrist.  *Id.* at ¶¶ 84-85.  Ms. Bento's FMLA leave was formally approved on that same day, effective February 11, 2014.  *Id.* at ¶ 86, Barnes FMLA Letter, Def. Ex. VV, ECF No. 90-10.

A little over a week later, Ms. Bento sent Ms. Barnes a letter signed by Dr. Tracy dated March 11, 2014, indicating that Ms. Bento was ready to return to work the next day.  L.R. 56(a)(1) ¶ 87; Tracy Letter 3/11/2014, Def. Ex. WW, ECF No. 90-11.  When Ms. Bento came to work on March 12, 2014, Ms. Barnes told her in person that she needed to provide a letter signed by her treating psychiatrist in order to return to work.  L.R. 56(a)(2) ¶ 88.  That same day, Ms. Bento provided a one-sentence letter signed by her psychiatrist stating that Ms. Bento was "cleared medically to return to work."  *Id.* at ¶ 89; Yun Letter, Def. Ex. XX, ECF No. 91-1.  Upon receipt of this letter, Ms. Barnes requested that Ms. Bento provide additional details from Dr. Yun in order to return to work.  Def. Mem. in Supp. at 52, ECF No. 84-1; Barnes Dep. 120-121, Pls. Ex. 16, ECF No. 101-4.[1]  On March 17, 2014, Ms. Bento provided an additional letter from Dr. Yun specifying his observations and stating that, having reviewed Ms. Bento's job description and observed her demeanor in-person, it was his conclusion that Ms. Bento was medically cleared to return to work.  Yun Letter 3/14/2014, Def. Ex. YY, ECF No. 91-2.  Ms. Bento returned to work the next day, on March 18, 2014.  L.R. 56(a)(1) ¶ 91.  On April 2, 2014, Ms. Bento resigned from her position with the City.  *Id.* at ¶ 97.

---

[1]    At her deposition, Ms. Barnes explained that she required additional details in order to ensure that it would be "safe" for Ms. Bento to return to work in light of concerns about potential self-harm on the part of Ms. Bento.  Pls. Ex. 16 at 120-121.

### E.  Ms. Bento's Requested Accommodations

Throughout the course of the interactions described above, Ms. Bento requested that the City make several adjustments to her workplace environment because she suffers from panic attacks and symptoms of anxiety.  Dr. Charney Rep., Pls. Ex. 29, ECF No. 103.  In December 2012 and again in September 2013, Ms. Bento requested that the City allow her to report to someone other than Ms. Graham.  L.R. 56(a)(1) ¶ 63.  In December 2012, the City offered Ms. Bento the opportunity to report to Mindy Natale, an individual who Ms. Bento claims is "extremely loyal" to Ms. Graham.  Pls. Ex. 4 at ¶ 59; Kelly-Steigman E-mails 12/5/2012, Def. Ex. CC, ECF No. 86-3.  Ms. Bento refused this offer, proposing instead that she report directly to the Mayor. *Id*.  The City declined to accommodate this request.  *Id*.

Ms. Bento also requested to be relocated to a separate building, which the City also declined to accommodate.  L.R. 56(a)(1) ¶ 64.  In April 2013, Dr. Tracy submitted a letter to the City on behalf of Ms. Bento requesting (1) that in-person meetings between Ms. Bento and Ms. Graham be tape-recorded; (2) that the door be left open during such meetings and that Ms. Graham use a non-threatening tone when speaking to Ms. Bento; and (3) that any third party in the room during meetings be "neutral and nonthreatening" to Ms. Bento.  Tracy Letter 4/24/2013, Def. Ex. BB, ECF No. 86-2.  The City agreed to leave the door open during in-person meetings; however, the City declined to allow meetings to be tape-recorded.  L.R. 56(a)(1) ¶ 66.  Nonetheless, Ms. Bento began tape-recording meetings herself, without the knowledge of Ms. Graham.  *Id*. at ¶ 67.

Plaintiffs initiated this lawsuit on September 23, 2013, Compl., ECF No. 1, and filed their Second Amended Complaint, which is the operative complaint in this action, on December 05, 2014. Second Am. Compl., ECF No. 57.

## II.  LEGAL STANDARD

The Court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has carried that initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If no reasonable jury could find in favor of the opposing party because "the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

A fact is "material" if it might affect the outcome of the case under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes concerning immaterial facts do not prevent summary judgment. *See id.*; *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("summary judgment cannot be avoided by immaterial factual disputes"). When ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).

## III.  DISCUSSION

For the reasons outlined below, each of the federal claims brought by Plaintiffs fails as a matter of law. Drawing all inferences in favor of the non-moving party, the Court finds that Defendants did not engage in retaliation against Plaintiffs for making complaints of discrimination in violation of Title VII.  The Court also finds that Defendants did not violate any rights protected by the Fourteenth Amendment of the U.S. Constitution, the City did not discriminate against Ms. Bento in violation of the ADA and the City did not interfere with any of Ms. Bento's rights under the FMLA.  Defendants' Motion for Summary Judgment therefore is **GRANTED** as to Counts One, Fourteen, Fifteen, Sixteen and Seventeen of Plaintiffs' Second Amendment Complaint.

### A.  THE FOURTEENTH AMENDMENT DUE PROCESS AND PRIVACY CLAIMS

In Count One of Plaintiffs' Second Amended Complaint, Ms. Bento alleges under 42 U.S.C. § 1983 that Ms. Graham and the City violated her Fourteenth Amendment rights to privacy and substantive due process.  Second Am. Compl. ¶¶ 80-85.  Defendants argue that their conduct does not amount to a constitutional violation.  Def. Mem. in Supp. at 9-15.  The Court agrees.

Ms. Bento argues that Ms. Graham violated her substantive due process rights by (1) improperly requesting access to her mental health records in January 2012 and disclosing information to other employees regarding Ms. Bento's relationship with her child's father; and (2) "intentionally creating circumstances likely to produce panic attacks."  Pl. Mem. in Opp. at 19-21.  However, it is undisputed that Ms. Bento was never forced to give Ms. Graham access to her medical records, nor did she suffer any adverse consequences from her refusal, apart from

Ms. Graham's verbal communications to other staff members regarding the conflict between Ms. Bento and the father of her son.  Pls. Ex. 4 at ¶ 29.

In order to establish a breach of constitutional rights to privacy and substantive due process, Ms. Bento must "show not only that [Defendants'] action was literally arbitrary, but that it was arbitrary in the constitutional sense."  *Miron v. Town of Stratford*, 976 F.Supp.2d 120, 129 (D. Conn. 2013) (citing *O'Connor*, 426 F.3d at 203).  "Mere irrationality is not enough: 'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due process violation based on executive action." *O'Connor*, 426 F.3d at 203 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

None of the actions alleged by Ms. Bento rises to this level.  The documented text message exchanges between Ms. Bento and Ms. Graham surrounding Ms. Graham's January 2012 request demonstrate that, without prompting, Ms. Bento volunteered detailed information regarding her legal troubles to Ms. Graham.  Def. Ex. O.  These records further show that Ms. Bento regularly volunteered detailed information regarding her physical health to Ms. Graham. *Id*.  Additionally, Defendants have introduced evidence suggesting that most of the supervisory meetings during which Ms. Bento suffered panic attacks resulted from genuine efforts to discuss work-related concerns, not from Defendants' intent to cause panic attacks.

Ms. Bento argues that Ms. Graham's request to access Ms. Bento's medical records "shocks the conscience" because it violates her constitutional right to privacy and confidentiality. *See Matson v. Board of Educ. of City School Dist. of New York*, 631 F.3d 57, 63-64 (2d Cir. 2011) ("As a general matter, there exists in the United States Constitution a right to privacy protecting the individual interest in avoiding disclosure of personal matters").  This right to privacy includes confidential mental health information.  *O'Connor v. Pierson*, 426 F.3d 187,

201 (2d Cir. 2005) ("Medical information in general, and information about a person's psychiatric health and substance-abuse history in particular, is information of the most intimate kind"). "It is settled law that the government may not, as a general rule, grant even a gratuitous benefit on condition that the beneficiary relinquish a constitutional right." *Id.*

The undisputed evidence in the record demonstrates that no such condition was involved here. Ms. Bento does not allege that Ms. Graham conditioned her employment or other benefit on her disclosure of the requested medical records, nor was any action directly taken against her when she refused to allow Ms. Graham to communicate with her therapist. Pls. Ex. 4 at ¶ 29. Furthermore, the information disclosed by Ms. Graham is not the type of information protected by the U.S. Constitution. While Ms. Graham did request access to medical records by requesting to speak with Ms. Bento's therapist, the information she disclosed to other staff when Ms. Bento refused was not health-related, but rather was information regarding Ms. Bento's family conflict. *Id.*

The Second Circuit has determined that, while medical information that is "excruciatingly private and intimate in nature," such as an HIV diagnosis, would rise to the level of having Fourteenth Amendment protection, personal information regarding other chronic health conditions such as fibromyalgia is not similarly protected. *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 64 (2d Cir. 2011). Ms. Bento's family issues are not the type of information typically considered "excruciatingly private and intimate in nature." *Id.; see also Palkimas v. Bella,* 510 Fed. Appx. 64 (2d Cir. 2013) (finding that no clearly established rights were violated when government officials disclosed to prosecuting authorities the involvement of Department of Children and Families ("DCF") with the plaintiff and his family). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of

16

official action most likely to rise to the conscience-shocking level." *County of Sacramento*, 523 U.S. at 849.  None of the conduct alleged here "shocks the conscience" as required for a constitutional violation.

Ms. Bento's constitutional claims fail as a matter of law, and summary judgment is granted with respect to these claims.

### B.   THE TITLE VII RETALIATION CLAIM

Ms. Bento and Ms. Graham each allege that the City unlawfully retaliated against them for engaging in protected activity under Title VII of the Civil Rights Act of 1964.  Second Am. Compl. ¶¶ 147-156.  Claims of retaliation under Title VII are analyzed according to the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015); *DeMoss v. Norwalk Bd. of Educ.*, 21 F. Supp. 3d 154, 167-170 (D. Conn. 2014).

To overcome a motion for summary judgment under the *McDonnell Douglas* framework, "a plaintiff must first satisfy an initial burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (internal quotation marks omitted).  Establishment of the prima facie case creates a presumption that the employer unlawfully discriminated against the employee, thus placing upon the defendant "the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993) (internal quotation marks omitted).

In order to make out a prima facie case of retaliation under Title VII, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected

activity; (3) an adverse employment action; and (4) a causal connection between the protected

activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315-16. "Even if a plaintiff

sets forth a prima facie case, however, this establishes only a rebuttable presumption of

retaliation, and where the defendant identifies a legitimate, non-retaliatory reason for the adverse

employment action, the burden shifts back to the plaintiff to show that the defendant's articulated

reason is a pretext for retaliation." *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110

(2d Cir. 2011).

      "[T]he burden of establishing this prima facie case in employment discrimination cases is

'minimal.'" *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citing *St. Mary's*

*Honor Center*, 509 U.S. at 506). "Moreover, because the facts inevitably vary in different

employment discrimination cases, both the Supreme Court and [the Second Circuit] have

explained that the 'prima facie proof required' in a given case will depend on the specific facts in

question." *Id.* Despite the relatively low standard of proof required, Ms. Dubiel and Ms. Bento

have failed to establish a prima facie case under Title VII, as there is no genuine issue of material

fact regarding whether Defendants took adverse action against Plaintiffs.

### 1.   Protected Activity & Defendant's Knowledge of Protected Activity

      The term "protected activity" refers to action taken to oppose "statutorily prohibited

discrimination." *Smith v. Johnson*, 636 F. App'x 34, 37 (2d Cir. 2016) (citing *Cruz v. Coach*

*Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). A plaintiff is not required to show that the

conduct she opposed was in fact unlawful in order to show that she engaged in "protected

activity"; rather, a plaintiff need only have had a "good faith, reasonable belief" that she was

opposing a practice prohibited by Title VII. *Kessler v. Westchester County Dept. of Social*

*Services*, 461 F.3d 199, 210 (2d Cir. 2006). While protected activity generally involves filing a

formal complaint, the Second Circuit has recognized that protected activity can include "informal protests of discriminatory employment practices, including making complaints to management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

"However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII.  Generalized complaints about a supervisor's treatment are insufficient." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)). Complaints presenting general allegations of harassment unrelated to protected class do not constitute protected activity under either Title VII or CFEPA.  *See, e.g.*, *Ruhling v. Tribune Co.*, No. 04-cv-2430, 2007 WL 28283, at *21 (E.D.N.Y. Jan. 3, 2007) (internal complaint of favoritism was not protected activity where plaintiff had not framed complaint as involving discriminatory conduct).

Ms. Bento and Ms. Dubiel both claim that they engaged in protected activity when they complained to the City and to the CHRO about a comment made by Ms. Graham in February 2012 that she would fire Ms. Bento if Ms. Bento ever became pregnant.  Second Am. Compl. ¶ 53; Def. Ex. V; Def. Ex. PPP.  Ms. Bento, however, was not pregnant at the time the comment was made and she does not claim to have been fired or otherwise treated in a discriminatory fashion on the basis of pregnancy or gender.  Furthermore, the record does not reflect that Ms. Dubiel herself made any complaints of discrimination beyond supporting some of Ms. Bento's complaints.  Pl. Mem. in Opp. 51-52, ECF No. 101.

Nonetheless, drawing all inferences in favor of Plaintiffs, the portions of their complaints that allege gender discrimination in the workplace may be sufficient to constitute protected activity for purposes of a retaliation claim under Title VII.  With respect to the second element of

a prima facie case, the parties do not dispute that the City had knowledge of Plaintiffs'
complaints regarding Ms. Graham's February 2012 comment.

### 2.   Adverse Employment Action & Causal Connection

In order to state a prima facie case for retaliation under Title VII, Plaintiffs must establish
that the City took adverse employment actions against them.  Employer conduct must be "more
disruptive than a mere inconvenience or an alteration of job responsibilities" in order to
constitute an "adverse employment action."  *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640
(2d Cir.2000) (internal quotation marks omitted).  An adverse employment action must be "a
materially significant disadvantage with respect to the terms of [the plaintiff's] employment."
*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir.2004) (holding that the denial of
plaintiff's request to transfer to a different location did not constitute an adverse employment
action for purposes of a prima facie discrimination case).

While Plaintiffs list several actions on the part of Ms. Graham and the City that could be
described as causing hardship or difficulty to Plaintiffs, these actions do not rise to the level of an
"adverse employment action" as required to establish a prima facie case under Title VII.  In
order for their Title VII retaliation claim to survive summary judgment, Plaintiffs are required to
"show that a reasonable employee would have found the challenged action materially adverse,
which in this context means it might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S. 53, 68 (2006) (internal quotes and citations omitted).  "The antiretaliation provision
protects an individual not from all retaliation, but from retaliation that produces an injury or
harm." *Id*. at 67.  This distinction is necessary to "separate significant from trivial harms" and to

ensure that Title VII is not misused as a "general civility code for the American workplace." *Id.* (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).

Ms. Bento argues that Ms. Graham acted against her in retaliation for making complaints of discrimination by attempting to remove Ms. Bento from the City's Long Term Recovery Task Force.  Pl. Mem. in Opp. at 55.  However, Ms. Bento did not suffer a legally recognized harm as a result of these attempts, as she was never removed from the Task Force, nor was she otherwise demoted from her position of community outreach worker.  L.R. 56(a)(1) ¶ 61.  According to Ms. Bento, Ms. Graham's unsuccessful attempts to remove her from the Task Force harmed her by causing her to have a panic attack on November 30, 2012, and she further alleges that she suffered additional harm from other panic attacks caused by "two-on-one" meetings with Ms. Graham and a third-party note-taker.  Pl. Mem. in Opp. at 55.

Nevertheless, the law is clear that Title VII only protects employees from actions that a "reasonable employee" would consider materially adverse.  *Burlington Northern*, 548 U.S. at 68. While Ms. Bento has reported experiences of severe anxiety in the workplace, under the objective *Burlington Northern* standard, holding tense office meetings about Ms. Bento's work responsibilities and including a "loyal" third-party note-taker in face-to-face meetings do not rise to the level of harm required for a finding of "materially adverse" retaliatory actions on the part of the City.

Ms. Dubiel, on the other hand, specifies even less retaliatory action against her on the part of the City.  In addition to general complaints of feeling "excluded and ostracized" and subjected to an "atmosphere of distrust," Ms. Dubiel alleges that certain job responsibilities were taken away from her after she made protected discrimination complaints.  L.R. 56(a)(2) ¶ 153. Specifically, Ms. Dubiel claims that she was removed from participation in several community

programs, such as the "Family Fun Night" and the "Thanks for Giving" program. *Id.* Although the reassignment of job duties can constitute material adversity under some circumstances—for example, when the new job duties post-reassignment are universally understood to be unfavorable—the law is clear that "reassignment of job duties is not automatically actionable." *Burlington Northern*, 548 U.S. at 71; *see also Patane v. Clark*, 508 F.3d 106, 116 n.8 (2d Cir. 2007) (plaintiff's allegations that "virtually all…secretarial functions" were removed was sufficient adversity to state a prima facie retaliation case, but being "kept entirely out of the departmental informational loop" would not be sufficient to constitute actionable retaliation).

"[N]ormally petty slights, minor annoyances, and simple lack of good manners" do not establish an adverse employment action as required to state a prima facie retaliation claim under Title VII. *Burlington Northern*, 548 U.S. at 68. *See, e.g. Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 26 (2d Cir. 2012) (two citations for insubordination insufficient to constitute adverse action because plaintiff did not present evidence that citations were a deviation from employer's normal disciplinary practices and citations would not have dissuaded reasonable employee from making discrimination complaint); *Tepperwein v. Entergy Nuclear Operations, Inc.* 663 F.3d 556, 568 (2d Cir. 2011) (institution of three investigations into plaintiff's conduct, counseling, and "empty" termination threats not materially adverse as a matter of law); *cf. Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d. Cir. 2010) (finding actionable retaliation under Title VII where plaintiff was transferred to a new supervisor who screamed at her on a daily basis and moved to an office where paint chips regularly fell on her desk and after she complained about severe sexual harassment against her in her workplace). Viewing the facts in the light most favorable to Plaintiffs, neither Ms. Dubiel nor Ms. Bento has

specified any adverse actions on the part of the City that would deter a "reasonable worker" from bringing a discrimination complaint, and their Title VII retaliation claims fail as a matter of law.

Having found that Ms. Bento and Ms. Dubiel failed to establish any adverse employment actions as a matter of law, the Court does not reach the question of whether Plaintiffs have sufficiently established the causation element of their retaliation claim.  Summary judgment is granted with respect to Plaintiffs' Title VII retaliation claims and Counts Fourteen and Fifteen of Plaintiffs' Second Amended Complaint are dismissed.

### C.    THE ADA REASONABLE ACCOMMODATION CLAIM

In Count Sixteen of the Second Amended Complaint, Ms. Bento seeks to hold the City liable for discrimination in violation of the Americans with Disabilities Act ("ADA").  Second Am. Compl. ¶¶ 157-165.  Ms. Bento's ADA claim is based on the stated disabilities of panic disorder, generalized anxiety and post-traumatic stress disorder.  L.R. 56(a)(2) ¶ 169; Pls. Ex. 29. Defendants argue that Ms. Bento was allowed all of the reasonable accommodations to which she was entitled under the ADA.  Def. Mem. in Supp. at 38-42.  The Court agrees with Defendants and summary judgment is granted to the City with respect to this claim.

Under the ADA, an employer is prohibited from discriminating against its employees on the basis of their disabilities, *see* 42 U.S.C. §12112(a); Conn. Gen. Stat. §46a-60(a)(1), including protection from discrimination in the form of "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual."  42 U.S.C. § 12112(b)(5).  When analyzing a claim of failure to make reasonable accommodation under the ADA, the Court applies the *McDonnell Douglas* burden-shifting framework used in other types of employment discrimination cases.  *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Prog., Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *McBride v. BIC Consumer Prods. Mfg., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009).

In order to establish a prima facie case on a reasonable accommodation claim, Ms. Bento must prove that (1) she is "a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (citations omitted). The City does not contest the first two elements of Ms. Bento's ADA claim; rather, the City argues that Ms. Bento was provided with all of the reasonable accommodations that she requested, and that any accommodations that were not made were not reasonable. Def. Mem. in Supp. at 38-41.

For purposes of a prima facie showing that a proposed accommodation is reasonable, "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Jackan v. New York State Dept. of Labor*, 205 F.3d 562, 567 (2000) (citing *Borkowski v. Valley Central School District*, 63 F.3d 131, 138 (2d Cir. 1995)). However, "'[s]ummary judgment is… appropriate where a plaintiff fails to identify a facially reasonable accommodation that the defendant refused to provide… or when the employer offers an accommodation that is plainly reasonable.'" *Howard v. United Parcel Serv., Inc.*, No. 12-cv-5344 (KBF), 2015 WL 1473517, at *7 (S.D.N.Y. Mar. 31, 2015) (quoting *Gronne v. Apple Bank for Sav.*, 1 F. App'x 64, 67 (2d Cir. 2001)). Indeed, "[t]hough the ADA requires covered employers to offer reasonable accommodations and places of public accommodation to offer reasonable modifications, the statute does not entitle a plaintiff to her accommodation or modification of choice." *Anderson v. E. Connecticut Health Network, Inc.*,

24

No. 3:12-CV-00785 RNC, 2015 WL 4393552, at *6 (D. Conn. July 16, 2015), aff'd sub nom.

*Anderson v. Eastern Ct. Health Network, Inc.*, No. 15-2605-CV, 2016 WL 4502034 (2d Cir.

Aug. 29, 2016).

Ms. Bento has made several requests to the City for accommodations in her work

environment. L.R. 56(a)(1) at ¶¶ 64-66. Some of those requests were granted, such as Ms.

Bento's request to leave the door open during all meetings and to instruct Ms. Graham to be

mindful of her tone; however, some of those requests were denied, including Ms. Bento's

requests to report directly to the Mayor and her request for relocation to a different building. *Id.*

Consistent with the applicable law, the Court finds that the City offered Ms. Bento

accommodations that were "plainly reasonable."

### 1.   Request to Adjust Supervision Structure

As one of her proposed accommodations, Ms. Bento requested that she be permitted to

report to a supervisor other than Ms. Graham. L.R. 56(a)(1) at ¶ 63. Ms. Bento specifically

requested that she be permitted to report directly to the Mayor, and, at one point, she also

requested to report to Tom Ivers, a City employee in a separate department. *Id.*; D. Mem. in

Supp. at 40. In the Second Circuit, "[w]hile there is no *per se* rule against a change in

supervisor, 'there is a presumption that a request to change supervisors is unreasonable, and the

burden of overcoming that presumption (i.e., of demonstrating that, within the particular context

of the plaintiff's workplace, that request was reasonable) therefore lies with the plaintiff.'"

*Theilig v. United Tech. Corp.* 415 Fed App'x 331, 333 (citing *Kennedy v. Dresser Rand Co.*, 193

F.3d 120, 122-23 (2d Cir. 1999)). Ms. Bento has not raised a genuine issue of material fact that

this presumption could be overcome in this case. In fact, there is nothing in the record from

which a reasonable juror could conclude that it would be reasonable for a municipal employee to report directly to the Mayor, the City's chief executive officer, and not her designated supervisor.

Significantly, it is undisputed that the City actively considered Ms. Bento's request and offered Ms. Bento the alternative of reporting to another City employee other than the Mayor, Mindy Natale, who served as the "point person in Ms. Graham's stead."  Def. Mem. in Opp. 40; Def. Ex. CC.  Ms. Bento rejected the City's offer, based on her assessment of Ms. Natale as someone who was "very loyal" to Ms. Graham and her negative experiences of Ms. Natale as a third-party note-taker in numerous meetings between Ms. Graham and Ms. Bento.  L.R. 56(a)(1) ¶¶ 63-66.

Since Ms. Bento is not legally entitled to "her accommodation or modification of choice," *Anderson*, 2015 WL 4393552, at *6, the Court finds that the City's proposed accommodation was "plainly reasonable" and not a violation of the ADA.

### 2.   Requests for Relocation and Tape-Recording

In addition to her requests for a change in her supervision structure, Ms. Bento made requests to be relocated to a separate building, to limit her interactions with Ms. Graham to e-mail or phone unless an in-person meeting was absolutely necessary, and to allow her meetings with Ms. Graham to be tape-recorded rather than having a note-taker present.  L.R. 56(a)(1) ¶¶ 63-66.  The undisputed record evidence, however, shows that the Department of Human Services is housed separately from the other City offices, and Ms. Bento's relocation would create problems regarding access to administrative staff, confidential files, and in-person client meetings.  L.R. 56(a)(1) ¶ 64; Def. Mem. in Supp. at 40.  Moreover, it is undisputed that Ms. Bento's position required regular communication with the Executive Director and that the content discussed during supervisory meetings commonly included confidential client

information.  *See* Community Outreach Worker Job Description, Def. Ex. L, ECF No. 84-16.
The record reflects that restricting in-person communications with the Executive Director and
tape recording supervision meetings would result in an undue burden to the City due to the
nature of the work at DHS, and Ms. Bento has not identified any material facts suggesting
otherwise.  Resp. to Interrogatories, Def. Ex. II, ECF No. 86-9; Def. Mem. in Opp at 41.  In the
absence of any evidence in the record that Ms. Bento's proposed accommodations were
consistent with her assigned job duties, the City's proposed accommodations were "plainly
reasonable."

Summary judgment is granted with respect to Ms. Bento's claims under the ADA.

### D.   THE FMLA INTERFERENCE CLAIM

In Count Seventeen of the Second Amended Complaint, Ms. Bento claims that the City
interfered with her rights under the FMLA.  Second Am. Compl. ¶¶ 166-173.  In order for Ms.
Bento's claim of interference with FMLA leave to survive summary judgment, she "must
establish: (1) that she is an eligible employee under the FMLA; (2) that the defendant is an
employer as defined by the FMLA; (3) that she was entitled to take leave under the FMLA; (4)
that she gave notice to the defendant of her intention to take leave; and (5) that she was denied
benefits to which she was entitled under the FMLA."  *Graziadio v. Culinary Inst. of Am.*, 817
F.3d 415, 424 (2d Cir. 2016).  The City does not dispute the first three of these elements, but it
disputes the fourth element, arguing that Ms. Bento has failed to make a prima facie case of
FMLA interference because she was not denied any benefits to which she was entitled.  The
Court agrees.

The rights protected by the FMLA include "the right to take leave, receive benefits
during leave and be restored to the same or equivalent position following leave."  *DeAngelo v.*

*Yellowbook Inc.*, 105 F. Supp. 3d 166, 182 (D. Conn. 2015).  With respect to FMLA interference

claims, the "employer's subjective intent is not an issue," and the question is simply whether the

employer provided the employee with the rights protected by the FMLA.  *Wanamaker v. Town of*

*Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014).  It is undisputed that Ms. Bento

was granted all of the FMLA leave that she requested during her employment with the City.

L.R. 56(a)(1) ¶¶ 80-91.  The parties agree that Ms. Bento's FMLA leave was granted for the full

period from February 11, 2014 until March 18, 2014, and there is no dispute that on March 18,

2014 Ms. Bento was permitted to return to her same position with the City.  *Id*.

Nonetheless, Ms. Bento claims that her rights were violated by the City's requests for

documentation from her treating psychiatrist Dr. Yun on two occasions: at the initiation of her

leave, when the City requested that her Certificate of Health Provider form be signed by Dr. Yun

rather than by Dr. Tracy, and again at the conclusion of her leave, when the City did not allow

her to return to work until she provided a letter from Dr. Yun specifically confirming that Ms.

Bento could return to work.  *Id.*; Def. Ex. XX; Def. Ex. YY.   The Court disagrees.

### 1.   Documentation Requirements in February 2014

The FMLA requires that an employer "shall advise an employee whenever the employer

finds a certification incomplete or insufficient, and shall state in writing what additional

information is necessary to make the certification complete and sufficient." 29 C.F.R. §

825.305(c); *Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 136, 153 (D. Conn. 2014).  If those

deficiencies are not cured within seven calendar days, the employer is entitled to deny FMLA

leave.  *Id*.  The record unequivocally reflects that the initial certification submitted by Dr. Tracy

identifies Ms. Bento as being "under care of psychiatrist and therapist" for conditions related to

anxiety.  Def. Ex. RR.  On February 25, 2014, upon receipt of the certification and addendum

submitted by Dr. Tracy, Ms. Barnes wrote to Ms. Bento referencing this section of Dr. Tracy's submission and clearly explaining that "FMLA documentation needs to be completed by your treating psychiatrist in order to verify said information."  Def. Ex. SS.  Given that the certifying physician himself repeatedly referenced Ms. Bento's treating psychiatrist when describing the basis for FMLA leave, there is no genuine issue of fact as to whether the City needed further certification from Ms. Bento's treating psychiatrist.

The written correspondence from Ms. Barnes also demonstrates that the City clearly communicated to Ms. Bento which specific actions were needed to cure the deficiencies in her original certification form and gave Ms. Bento ample time to obtain the requested documentation.  Def. Ex. SS.  Ms. Bento submitted a signed certification from Dr. Yun on March 4, 2014, 7 days after Ms. Barnes requested such certification, and her request for FMLA leave was approved that same day.[2]  Def. Ex. VV.  Since there is nothing in the record suggesting a lack of compliance with the applicable FMLA regulations, Ms. Bento's FMLA claim on this basis must fail.

### 2.   Documentation Requirements in March 2014

With respect to Ms. Bento's argument that the City interfered with her FMLA rights by requiring additional documentation from Dr. Yun before allowing her to return to work (Second Am. Compl. ¶ 171), the Court finds that none of Ms. Bento's rights were violated by the 6-day delay in her reinstatement.

---

[2]      Ms. Bento alleges that she suffered "increased anxiety and stress associated with the uncertainty regarding whether the City would allow her medical leave to be covered by the FMLA."  Second Am. Compl. ¶ 172.  Even if the City were found to be unlawfully responsible for Ms. Bento's anxiety, a conclusion that this Court declines to reach, this type of emotional harm is not recoverable as damages under the FMLA.  *See Allen v. Verizon Wireless*, No. 3:12-CV-00482 JCH, 2015 WL 3868672, at *12 (D. Conn. June 23, 2015), *on reconsideration*, No. 3:12-CV-00482 JCH, 2015 WL 4751031 (D. Conn. Aug. 11, 2015), and *aff'd*, No. 15-2392-CV, 2016 WL 3435282 (2d Cir. June 20, 2016) ("Because the FMLA specifically lists the types of damages that an employer may be liable for, district courts in this circuit, as well as other circuits that have considered the issue, have determined that recovery for emotional distress, pain and suffering, and other intangible injuries is not available under the FMLA").

Under the regulations governing FMLA leave, an employer must explicitly notify the employee of its request for a specific "fitness-for-duty" certification at the time FMLA leave is initiated in order to require such a certification as a condition for returning to work.  *Powell v. Metro One Loss Prevention Servs. Group, Inc*., 2013 U.S. Dist. LEXIS 111601, *19 (S.D.N.Y. July 26, 2013) ("An employer may delay or deny an employee's reinstatement for failure to provide a fitness-for-duty certification only if, in accordance with the regulations, the employer requested such a certification when it initially notified the employee that he was being placed on FMLA leave"); *Reyes v. Phoenix Beverages, Inc.,* 2016 WL 4991530 (E.D.N.Y., Sep. 15, 2016) (denying summary judgment on plaintiff's interference claim where employer required a specific certification on employee's return to work without providing the necessary notice to employee); 29 C.F.R. § 825.312(e).  According to 29 C.F.R. § 825.300(d)(3), this notice to the employee must include a list of the "essential functions" of the employee's position.

As long as proper notice has been given to the employee, an employer is permitted to require a "fitness-for-duty certification … with regard to the particular health condition that caused the employee's need for FMLA leave" and the employer may "delay restoration to employment" until a proper certification has been submitted.  29 C.F.R. §§ 825.312(b), 825.312(e).  Employers "may require that the certification specifically address the employee's ability to perform the essential functions of the employee's job," and employers are not required to bear any of the costs involved in obtaining a required fitness-for-duty certification.  *Id*., 29 C.F.R. §§ 825.312(c).

The undisputed facts show that City complied with all of the applicable FMLA regulations regarding the additional information requested for Ms. Bento's return to work.  The parties agree that on February 25, 2014, before formally approving Ms. Bento's request for

FMLA leave, Ms. Barnes specifically informed Ms. Bento that "the treating psychiatrist will need to provide documentation that you safely are able to perform the duties and responsibilities of your job prior to returning to work." Def. Ex. SS. In her March 4, 2014 letter formally approving FMLA leave, Ms. Barnes again reiterated this requirement, stating: "When you are ready to return to work, you will need to provide your supervisor with a note from your doctor stating that you are able to return to work without restriction(s)." Def. Ex. VV. Included with this letter was a complete copy of Ms. Bento's job description detailing the essential functions of her position. *Id.*

Despite this clear notification, Ms. Bento nonetheless provided a letter from Dr. Tracy, not her treating psychiatrist, on March 11, 2014, stating that she was cleared to return to work. Def. Ex. WW. This letter consisted of one sentence stating generally that "Erica is medically stable" and may return to work on March 12th. *Id.* When Ms. Bento came into work on March 12th, Ms. Barnes again informed her that she needed to provide a letter from her treating psychiatrist in order to return to work. L.R. 56(a)(1) ¶ 88.

When Ms. Bento provided a new one-sentence letter from Dr. Yun stating generally that Ms. Bento was "medically cleared" to return to work, without reference to any of Ms. Bento's job duties, Ms. Barnes requested a more detailed letter consistent with the written notice previously provided in Ms. Barnes' e-mail correspondence to Ms. Bento on February 25, 2014, which clearly stated that the treating psychiatrist needed to provide documentation confirming that Ms. Bento would be "able to perform the duties and responsibilities of [her] job." Pl. Ex. 16; Def. Ex. SS. Under the FMLA regulations, the City was entitled to require that Dr. Yun's certification "specifically address" Ms. Bento's job functions, *see* 29 C.F.R. § 825.312(b), and

Dr. Yun's statement that Ms. Bento was "medically cleared" did not fully provide the requested documentation.  Def. Ex. XX.

As Ms. Bento has failed to establish the existence of a genuine dispute of material fact regarding the final element of her FMLA interference claim, this claim fails as a matter of law.

**IV.  CONCLUSION**

Defendants' Motion for Summary Judgment is **GRANTED** as to Counts One, Fourteen, Fifteen, Sixteen and Seventeen of Plaintiffs' Second Amendment Complaint.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.

SO ORDERED in Bridgeport, Connecticut this 30th day of September, 2016.

/s/ Victor A. Bolden
DISTRICT JUDGE
DISTRICT OF CONNECTICUT